UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MARY HOLMES, L.V., DENISE DAVIS, ANDREW DALLAS, and EMPOWER MISSOURI,<br><br>Plaintiffs,<br><br>*-against-*<br><br>ROBERT KNODELL, in his official capacity as Acting Director of the Missouri Department of Social Services,<br><br>Defendant. | No. 2:22-CV-04026<br><br>**FIRST AMENDED COMPLAINT** |

## PRELIMINARY STATEMENT

1. This action challenges Missouri policies and practices that deprive eligible households, including persons with disabilities, of access to critically needed, subsistence level Supplemental Nutrition Assistance Program ("SNAP") benefits, formerly known as Food Stamps, in violation of federal law. Without meaningful access to SNAP benefits, these individuals and households face serious threats of hunger and related risks to their health [1]

2. During the COVID-19 pandemic, the State of Missouri has experienced an unprecedented level of job loss and hunger. Even as the State reopens, the economic

[1] Until recently, the program now known as "SNAP" was still called "Food Stamps" in Missouri. As noted later, Congress changed the name of the program from Food Stamps to SNAP in 2008. "SNAP" and "Food Stamps" are used interchangeably in this Complaint.

consequences continue to reverberate, and SNAP remains a key source of support for low-income households.

3. Defendant Robert Knodell, in his official capacity as Acting Director of the Missouri Department of Social Services ("DSS"), has imposed a series of barriers to accessing SNAP benefits. Many of these barriers predated the COVID-19 crisis, but the pandemic and its economic impacts have only made the situation more dire. During the pandemic, Defendant has doubled down on harmful policies and practices, depriving Missourians, including Plaintiffs Holmes, L.V., and Davis, of subsistence benefits in the midst of a global health and economic crisis.

4. The application process for SNAP involves three key steps for applicants: filing an application, completing an interview, and submitting required verification. Defendant's policies impose significant barriers to the completion of all three of these steps. As a result, thousands of Missourians cannot complete the application process.

5. The SNAP application process in Missouri is built around the use of a dysfunctional, centralized call center. The call center was overloaded and ineffective even before the pandemic, and it has continued to be so even since DSS offices reopened to the public. Wait times are extraordinarily long, and the call center frequently deflects calls.[2]

6. When DSS offices are closed or otherwise inaccessible, the call center is the only way for SNAP applicants without computer or Internet access to request a SNAP application form.

7. Once a SNAP application is filed on paper or electronically, the applicant must complete an interview via the call center. In practice, Missouri does not provide in-person

[2] When Defendant's call center is at capacity, calls are "deflected." When a call is deflected, the caller is not placed on hold to wait for a representative. Instead, the call center system automatically terminates the call.

interviews. As a result, many applicants, including Plaintiffs Holmes, L.V. and Davis, cannot complete interviews required for their application.

8. SNAP applicants are not informed of which documents they need to submit to complete the verification stage of their application until after their interview. If an applicant cannot complete their interview, they are not given a chance to provide their verifications.

9. The situation is even worse for people with disabilities. Defendant Knodell has failed to establish any process through which a Missouri resident can request a reasonable accommodation or file a grievance, as required by the Americans with Disabilities Act ("ADA").

10. Defendant's failure to provide reasonable accommodations, or, indeed, even a process through which such an accommodation might be requested, causes significant harm to Missourians with disabilities in the best of times. It is even worse during the COVID-19 pandemic, when in-person office access is inconsistent, visiting an office in person is a health risk, and significant parts of agency operations are performed via the call center.

11. Thousands of Missourians, including the individual Plaintiffs in this action, cannot meaningfully access SNAP as a result of Defendant's policies.

12. Plaintiffs seek declaratory, as well as preliminary and permanent injunctive relief to enjoin the Defendant, in his official capacity as DSS Director, from failing to provide timely and meaningful access to SNAP benefits to low-income Missourians, including the Plaintiffs in this action.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. § 1331, which provides for jurisdiction in the United States district courts over civil actions arising under the Constitution, laws, or treaties of the United States, including actions brought pursuant to 42 U.S.C. § 1983;

and by 42 U.S.C. § 12133, which provides for jurisdiction over actions arising under Title II of the ADA..

14. This is an action for declaratory and injunctive relief to enforce Plaintiffs' rights under provisions of the Food and Nutrition Act of 2008, Title II of the ADA, and the Fourteenth Amendment to the United States Constitution.

15. Declaratory relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

16. Venue properly lies with the Western District of Missouri pursuant to 28 U.S.C. § 1391(b), as the agency run by Defendant Knodell is headquartered within the Western District, and a substantial part of the events giving rise to Plaintiffs' claims occurred within the Western District.

## **PARTIES**

17. Plaintiff Mary Holmes resides in St. Louis, Missouri.

18. Plaintiff L.V. resides in Warren County, Missouri.

19. Plaintiff Andrew Dallas resides in Jefferson County, Missouri.

20. Plaintiff Denise Davis resides in Phelps County, Missouri.

21. Plaintiff Empower Missouri is a not-for profit organization organized under Missouri law that works to ensure that all people in Missouri have access to adequate nutrition, quality healthcare, decent housing, and appropriate education; and all people in Missouri are treated with dignity and fairness.

22. Defendant Robert Knodell is the Acting Director of the Missouri Department of Social Services, the agency responsible for administering SNAP in the State of Missouri and

ensuring compliance with federal law relating to SNAP. Defendant Knodell is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### Supplemental Nutrition Assistance Program "SNAP"

23. In 1964, Congress established the federally funded, state-administered Food Stamp Program in order to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1

24. Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program, and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).

25. Regulations promulgated by the Food and Nutrition Service ("FNS") of the United States Department of Agriculture ("USDA") implement the SNAP Act, applicable to all state agencies administering SNAP programs, including DSS, the agency administered by Defendant. *See* 7 U.S.C. §§ 2013(c); 2020 (e)(6)(A).

26. The federal government provides complete funding to states for all SNAP benefits and at least 50% of a state's costs to administer the program. 7 U.S.C. §§ 2013(a), 2019, 2025(a); 7 C.F.R. §§ 277.1(b), 277.4.

27. Participating states designate a single state agency responsible for administering the program and complying with the federal SNAP requirements. 7 U.S.C. § 2020(a), (d), (e).

28. Missouri participates in SNAP. DSS is the single state agency (hereinafter "administering agency") responsible for administering SNAP in Missouri.[3]

29. When administering Missouri's SNAP program, DSS must comply with federal SNAP statutes and regulations. *See* 7 U.S.C. § 2020(d), (e).

30. Under federal law, to be eligible for SNAP benefits, a household's net income must be below the federal poverty line and its available resources may not exceed $2,000 (or, where a household includes a disabled member or member 60 years of age or older, $3,000). 7 U.S.C. § 2014(c), (g).

31. The administering agency must provide SNAP benefits to all eligible households who submit an application for participation in SNAP. 7 U.S.C. § 2014(a).

32. The administering agency must provide "timely, accurate, and fair service to applicants for, and participants in" the SNAP program. 7 U.S.C. § 2020(e)(2)(B)(i).

33. The length of time the administering agency has to deliver SNAP benefits to eligible households is measured from the date the application is filed with the agency. 7 C.F.R. § 273.2(c)(1).

34. The administering agency must provide SNAP benefits to eligible applicants within 30 days of the submission of the household's SNAP application. 7 U.S.C. § 2020(e)(3); 7 C.F.R § 273.2(e)(3).

35. The administering agency must provide SNAP benefits to certain recipients with very low income and liquid resources within 7 days of the submission of the household's SNAP application. 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(1).

[3] *See* Mo. Rev. Stat. § 205.960, et seq.

36. The administering agency must directly facilitate the SNAP application process according to specific statutory and regulatory mandates, including those listed below.

**Duty to Facilitate Submission of SNAP Applications**

37. Under the SNAP Act and implementing regulations, the administering agency must permit households to file an application on the first day that they contact the local SNAP office during office hours. 7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(1), (c)(2)(i).

38. The administering agency must "encourage" households to file an application the same day the household or its representative contacts the SNAP office in person or by telephone and expresses interest in obtaining SNAP or expresses concerns that indicate food insecurity. 7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(2)(i).

39. The administering agency shall not deny nor interfere with a household's right to apply for SNAP in writing. 7 C.F.R. § 273.2 (c)(1)(ii).

40. The administering agency must make application forms "readily accessible" to potentially eligible households. 7 C.F.R. § 273.2(c)(3)(i). Paper applications must be made "readily accessible and available" even if the administering agency also accepts applications through other means. 7 C.F.R. § 273.2(c)(3)(ii).

41. "Regardless of the type of system the State agency uses, the State agency must provide a means for applicants to immediately file an application that includes only name, address and signature." 7 C.F.R. § 273.2(c)(3)(i).

42. The administering agency must make applications accessible to persons with disabilities, in accordance with Section 504 of the Rehabilitation Act and the ADA. 7 C.F.R. § 273.2(c)(3)(i).

43. The administering agency must mail an application form to a household on the same day a telephone request is received. 7 C.F.R. § 273.2(c)(2)(i).

44. The administering agency must inform households of their rights and responsibilities in the SNAP program. 7 C.F.R. § 272.5(b).

45. The administering agency must post signs in the certification office explaining processing standards and the right to file an application the day of initial contact. 7 C.F.R. § 273.2(c)(4).

46. The administering agency must "provide on [its] Web page the addresses and phone numbers of all State SNAP offices and a statement that the household should return the application form to its nearest local office." 7 C.F.R. § 273.2(c)(3)(i).

**Duty to Facilitate Interviews and Submission of Verification**

47. Under federal regulations, the administering agency must schedule an interview for all SNAP applicant households who are not interviewed on the day they submit their applications, and must schedule all interviews as promptly as possible to ensure eligible households receive an opportunity to participate within 30 days after the application is filed. 7 C.F.R. § 273.2(e)(3).

48. If a SNAP applicant household misses a scheduled interview, the administering agency must notify the household that the household is responsible for rescheduling the interview. If the household contacts the administering agency within the 30-day period following submission of the application, the administering agency must re-schedule the interview. Even if the household fails to appear for the first scheduled interview, the administering agency may not deny a household's application prior to the 30th day after an application is filed. 7 C.F.R. § 273.2(e)(3).

49. DSS has a waiver from the USDA's Food and Nutrition Service (FNS) that allows DSS to use an interview procedure that deviates from the process laid out in FNS regulations.

50. Pursuant to the waiver, DSS is not required to schedule the SNAP interview at a specific date and time. Instead, DSS must provide applicant households with a notice, known as an interview letter, instructing them to call the call center within five days of submitting their application.

51. Also pursuant to the waiver, applicants who do not complete their interview within five days are to be sent a Notice of Missed Interview, also known as a missed interview letter, instructing applicants that they must complete their interview within 30 days of submitting their application, or their application will be denied.

52. The administering agency may conduct interviews required to determine eligibility at the SNAP office, at another mutually acceptable location, or by telephone under specified circumstances. 7 C.F.R. § 273.2(e).

53. If the administering agency opts to conduct telephone interviews routinely, the agency must make face-to-face interviews available to any household that requests one. 7 C.F.R. § 273.2(e)(2). The interview waiver discussed at paragraphs 49-51 does not absolve the agency of its obligation to provide face-to-face interviews upon request.

54. During the interview, agency staff " . . . must not simply review the information that appears on the application, but must explore and resolve with the household unclear and incomplete information." 7 C.F.R. § 273.2(e)(1).

55. As part of the application process, applicants must verify certain information related to their eligibility as prescribed by 7 C.F.R. § 273.2(f).

56. At the time of application, the administering agency must notify the household of the verification requirements it must meet, and must inform the household of the agency's duty to assist the household in obtaining required verification as required by 7 C.F.R. § 273.2(c)(5), (f)(5).

57. "At minimum," the notice must include "examples of the types of documents the household should provide and explain the period of time the documents should cover." 7 C.F.R. § 273.2(c)(5).

58. At the time of application, the administering agency must provide a clear written statement of the acts a household must complete to obtain verification and complete the application. 7 U.S.C. § 2020(e)(3).

59. The administering agency must assist households in obtaining required verification. 7 C.F.R. § 273.2 (f)(5)(i).

60. The administering agency must provide households with notices of required verifications and the due date for such verifications, and give the household at least 10 days to provide the required information. 7 C.F.R. §§ 273.14(b)(4), 273.2(f).

61. If a household's eligibility is not determined by the end of its current certification period, due to expiration of the time period allowed for submitting missing verification, then the administering agency must provide an opportunity to participate, if eligible, within five working days after the household submits the missing verification. 7 C.F.R. § 273.14(b)(4).

62. When an administering agency finds a household ineligible for SNAP, the agency must send a notice of denial "as soon as possible but not later than 30 days" following the application's filing. Under federal regulations, the agency may only deny an application on the 30th day after filing if 1) the household has failed to appear for a scheduled interview and has

expressed no further interest in pursuing the application; or 2) the household has failed to submit requested verification despite the administering agency providing assistance in obtaining the verification. 7 C.F.R. § 273.2(f)(3). The interview waiver discussed at paragraphs 49-51 does not absolve DSS of its responsibility to assist households in obtaining verifications.

63. In order to receive SNAP benefits after the end of its certification period, a household must submit an application for recertification and be found eligible. 7 U.S.C. § 2020(e)(4).

64. Before the start of the last month of the household's certification period, the administering agency must provide each household with a Notice of Expiration ("NOE") of its certification period and the need to submit an application for recertification to receive ongoing SNAP benefits. 7 U.S.C. § 2020(e)(4).

65. As to each household that applies for recertification by the specified date and is eligible, the administering agency must provide the SNAP allotment no later than one month after the household received its last allotment issued pursuant to the prior certification period. 7 U.S.C. § 2020(e)(4).

66. The administering agency must provide eligible households an opportunity to receive SNAP benefits no later than either 30 calendar days after the date the household received its last allotment or by its normal issuance date in the month following the end of its certification period. 7 C.F.R. § 273.14(d).

67. Households that submit recertification applications by the fifteenth day of the last month of the certification period have timely applied for recertification and the administering agency must provide an opportunity for those households, if still eligible, to participate in SNAP

by the household's normal benefit issuance date in the month after the end of its current certification period. 7 C.F.R. § 273.14(c)(2), (d).

68. Administering agencies must process recertification applications received after the fifteenth day of the last month of the certification period, but before the end of the certification period, within 30 days from the date of application and, as to those households found eligible, must provide a full month's SNAP allotment for the first month of the new certification period. 7 C.F.R. § 273.14(e)(1).

**Americans with Disabilities Act**

69. Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress specifically found, *inter alia*, that "discrimination against individuals with disabilities persists in such critical areas as. . . access to public services." 42 U.S.C. § 12101(a)(3).

70. Congress further declared that individuals with disabilities "continually encounter various forms of discrimination, including outright intentional exclusion . . . failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria . . . and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

71. The ADA provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1), (2).

72. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

73. The ADA contains express statutory rules of construction, including: "The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A).

74. Title II of the ADA, which applies to state and local governments and their departments, agencies, and instrumentalities as "public entities," 42 U.S.C. § 12131(1), specifically bars discrimination against individuals with disabilities, with respect to access to public programs, activities, benefits, and other services. 42 U.S.C. §§ 12131-12134.

75. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

76. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . ., or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

77. DOJ regulations implement Subtitle A of Title II of the ADA, applicable to all programs, benefits, activities, and services provided or made available by public entities,

including Defendants (with the exception of specified transportation activities). 28 C.F.R. §§ 35.101, 35.102.

78. Congress directed the DOJ regulations to be consistent with the ADA and with the coordination regulations promulgated by the former U.S. Department of Health, Education and Welfare, pursuant to Section 504 of the Rehabilitation Act of 1973. 42 U.S.C. § 12134(b).

79. The implementing DOJ regulations, 28 C.F.R. § 35.130(b)(1)(i)-(ii), specify: "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability -- (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; [or] (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . ."

80. Implementing DOJ regulations further require: "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . ." 28 C.F.R. § 35.130(b)(3)(i)-(ii).

81. Implementing DOJ regulations further require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

82. Implementing DOJ regulations require public entities with more than 50 employees to designate at least one person to coordinate its compliance responsibilities under the Act, and to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited" by the ADA. 28 C.F.R. § 35.107.

83. Implementing DOJ regulations, at 28 C.F.R. § 35.106, require public entities to make available to "applicants, participants, beneficiaries, and other interested persons information regarding the provisions of" the ADA and its applicability to the services, programs, or activities of the public entity, and further make this information available in a manner found necessary to apprise such persons of the protections against discrimination assured them by the Act.

## FACTUAL BACKGROUND

### COVID-19 in Missouri

84. The COVID-19 pandemic brought with it an unprecedented hunger crisis.

85. Between June 2019 and June 2021, the number of meals provided by the St. Louis Area Foodbank increased by 53%.[4] In June 2021, the Foodbank was still distributing between one million to one and a half million more meals per month than it did before the pandemic.[5]

86. Defendant has failed to address this hunger crisis, and has instead continued to embrace policies and practices, described in full below, that violate Plaintiffs' legal rights.

---

[4] Karen Robinson-Jacobs, *St. Louis community gardens and food pantries head off COVID-spurred food crisis*, ST. LOUIS PUBLIC RADIO (Nov. 21, 2021), https://news.stlpublicradio.org/economy-business/2021-11-21/st-louis-community-gardens-and-food-pantries-head-off-covid-spurred-food-crisis.

[5] Michael Sainato, *US food banks brace for demand as Republicans end unemployment benefits*, THE GUARDIAN (June 14, 2021) https://www.theguardian.com/us-news/2021/jun/14/us-food-banks-unemployment-republican-states-pandemic?utm_term=Autofeed&CMP=twt_b-gdnnews&utm_medium=Social&utm_source=Twitter#Echobox=1623662031.

87. Each wave of the COVID-19 pandemic has hit Missouri hard, and the current Omicron wave is no exception.

88. As of February 14, 2022, Missouri's PCR positivity rate was 17.8%.[6]

89. As of February 14, 2022, the entire state of Missouri is classified by the CDC as having a high level of community transmission of COVID-19.[7]

90. The state of Missouri currently has no mask mandate in place, nor does DSS.

91. As of February 14, 2022, only 55.7% of the population of Missouri has completed their COVID-19 vaccination.[8]

92. DSS does not require DSS employees to be vaccinated against COVID-19. In fact, it is the policy of Missouri's executive branch merely to "encourage voluntary vaccination."[9]

**Defendant's Administration of Missouri's SNAP Program Prevents Access to Benefits**

93. In Missouri, DSS, headed by Defendant Knodell, administers the SNAP program via its Family Support Division.

94. DSS operates resource centers throughout the State. At resource centers, SNAP applicants should be able to submit applications and supporting documentation, ask questions about their applications and benefits, and be interviewed as part of the application process.

---

[6] MISSOURI DEP'T OF HEALTH & SENIOR SERVS., *Covid-19 in Missouri at a Glance*, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/ (last visited Feb. 14, 2022).

[7] CTRS. FOR DISEASE CONTROL & PREVENTION, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, https://covid.cdc.gov/covid-data-tracker/#cases_community (last visited Feb. 14, 2022).

[8] MISSOURI DEP'T OF HEALTH & SENIOR SERVS., *Covid-19 Vaccinations in Missouri*, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php/ (last visited Feb. 14, 2022).

[9] Mo. Exec. Order No. 21-10, https://www.sos.mo.gov/library/reference/orders/2021/eo10.

95. On March 24, 2020, DSS closed all of its offices in response to the COVID-19 pandemic. DSS ordered all staff to work from home.

96. In March 2021, DSS began opening some offices by appointment only. The only way to make an appointment was via DSS's call center. Eventually, DSS began allowing members of the public to book appointments on its website.

97. Although all DSS offices officially reopened to the public on May 17, 2021, as of this filing, DSS still encourages SNAP applicants to make an appointment via the agency's website or call center, and DSS staff frequently turn applicants away when they try to complete an interview in person.

98. DSS has sought permission from the Governor to return its workforce to an in-person/remote work hybrid, which, unless undertaken with extreme care, would necessitate a reduction or elimination of in-person services.

99. For many applicants, the opening of the resource centers is merely theoretical because the resource center's hours are limited. As of February 2022, less than a third of 141 resource centers listed on DSS's website were open to the public five days a week, and more than half were open three days a week or fewer.[10] None of the resource centers were open to the public outside of 8:00 am to 5:00 pm Monday through Friday, and most were open for more limited hours than that.

100. Because of DSS's lack of COVID-19 safety protocols, *supra*, paragraph 92, Missourians who do manage to seek assistance in person at a resource center risk contracting COVID-19 while attempting to obtain essential subsistence benefits.

[10] DSS lists 141 resource centers on its website. According to the website, of these offices, 20 were closed, 10 were open only one day a week, 38 were open two days a week, 23 were open three days a week, eight were open four days a week, and 42 were open five days a week.

101. Missouri residents may submit an application for SNAP online. They also have the option of downloading and printing an application. Filing or obtaining an application online requires reliable Internet access and technological literacy—two things that are out of reach for many SNAP applicants, including Plaintiff Holmes.

102. When resource centers are open, applicants for SNAP can obtain paper applications from and deliver completed applications to DSS in person.

103. Applicants for SNAP can submit paper applications via mail, but only if they are able to acquire an application form.

104. If an applicant for SNAP does not have a computer and reliable Internet access, the only way to obtain an application without going in person to a resource center is by submitting a request via the call center.

105. When DSS offices are closed or unavailable, the call center is the only way for SNAP applicants without computer or Internet access to contact the agency.

106. More than 1.26 million Missourians, or 21% of the state's population, do not have access to high speed Internet.[11]

107. As part of the application process, applicants must complete an interview with DSS.

108. DSS continues to operate its SNAP program in accordance with the interview waiver discussed at paragraphs 49-51, *supra*.

---

[11] CTR. FOR APPLIED RSCH. & ENGAGEMENT SYSS., *The State of Broadband in Missouri*, https://apps.cares.missouri.edu/portal/apps/MapSeries/index.html?appid=d4a2252250db472e985a6ead1a1d4ed7 (last visited Feb. 18, 2022).

109. The waiver requires DSS to provide applicant households with a notice known as an Interview Letter, which instructs applicants to contact the call center for an interview within five days of submitting their application.

110. DSS is required under the waiver to send applicants who do not complete an interview within five days of their application a Notice of Missed Interview, instructing applicants that they must complete an interview within 30 days of submitting their application, or their application will be denied.

111. The waiver states that DSS has implemented predictive dialing, through which a computer system in their call center continuously dials from a list of numbers in turn until an individual on this list picks up. According to the waiver, the predictive dialer calls applicants for the first four days after the relevant application date.

112. In actual practice, DSS's use of the predictive dialer is inconsistent. Not all applicants are called within the first four days of submitting their application. Some applicants are only called one time. Many applicants, including Plaintiff Holmes, are called by the predictive dialer only to be placed in the call center queue as if they themselves had dialed the call center. Some applicants are never called by the predictive dialer at all.

113. DSS does not notify applicants of when to expect a call from the predictive dialer, so some applicants, including Plaintiff L.V., miss the call.

114. DSS does not consistently provide applicants with the Interview Letter required by the waiver.

115. If DSS fails to call an applicant for SNAP for an interview, or if the applicant does not answer the call, the applicant must call DSS to complete their interview.

116. Even though DSS is required to make a face-to-face interview available at an applicant's request, it requires applicants instead to conduct the interview via the DSS call center. DSS routinely refuses to provide face-to-face interviews to SNAP applicants, including Plaintiff Holmes.

**Defendant's Call Center is Dysfunctional and Prevents Plaintiffs and Other Missourians from Accessing SNAP**

117. The vast majority of interviews are conducted via the call center. When the resource centers are open, individuals who attempt to complete their interviews face-to-face are often directed to a phone—which they must use to reach the call center, as if they had remained at home.

118. For many years, the call center has been riddled with problems that limit and restrict Missourians' ability to successfully apply for SNAP.

119. If an applicant does not complete the interview, DSS denies their application for failure to complete the interview, regardless of the reason for the default.

120. Many applicants cannot complete their interviews via the call center because the call center is dysfunctional.

121. The call center's wait times are long, and calls are frequently dropped before an applicant has a chance to speak with anyone from DSS.

122. Some applicants are kept on hold for so long that they exceed the maximum call length allowed by their phone provider. This occurs frequently enough that DSS has posted an infographic to the agency Facebook page warning applicants of the possibility that their call might be cut off due to phone carrier limits. *See* Compl. Exhibit A, ECF 1-1.

123. DSS imposes capacity limits on call center processing lines. If the capacity limit is reached, any additional incoming calls are rejected. This is known as a call being "deflected."

124. DSS tracks various call center performance metrics. The agency's data shows that wait times and deflection rates have fluctuated over the course of the past two years, but that consistently, many of the people calling DSS for SNAP-related reasons are prevented by call center dysfunction from reaching agency staff.

125. The call center has a designated SNAP processing tier, which is dedicated to completing SNAP interviews. In December 2020, 205,722, or 80.35%, of these calls were deflected, and 107,775, or 62.65%, were deflected in January 2021. In May 2021, 13,729 calls were deflected.

126. Agency documents show that in August 2021, DSS deflected 22% of interview calls, and 59% of interview calls were abandoned. In September 2021, DSS deflected 15% of interview calls, and 75% were abandoned. In October 2021, DSS deflected 12% of interview calls, and 82% were abandoned. In November 2021, DSS deflected 15% of interview calls, and 86% were abandoned. In December 2021, DSS deflected 26% of interview calls, and 74% were abandoned.

127. Agency data shows that the average wait time for the dedicated SNAP interview line in December 2021 was two hours, 32 minutes, and 31 seconds. In November 2021, the average wait time was two hours, 51 minutes, and 32 seconds.

128. Prior to 2015, DSS contracted with a private company, YoungWilliams, to operate the call center.

129. In August 2014, DSS sent YoungWilliams a letter of concern demanding prompt corrective action to ameliorate excessive wait times for Income Maintenance Support callers. *See* Compl. Exhibit B, ECF 1-2. The wait times in question were in excess of six minutes.

130. Recent wait times far exceed those for which DSS demanded corrective action from YoungWilliams in 2014, yet DSS has not remedied its own excessive call center wait times or the rate of dropped calls.

131. Beginning in or around November 2021, DSS implemented changes to the phone system. The automated system now asks callers seeking a SNAP interview a total of twenty-two questions. Previously, the automated system asked callers only eight questions.

132. The automated questions take at least five minutes to complete. Callers seeking a SNAP interview must answer the questions each and every time they call, even if they have answered the questions on a prior attempt to reach DSS.

133. The current questions are:

- Have you, or any member of your household, been convicted of buying or selling Food Stamp benefits of $500 or more after 9-22-96?
- Are you or any member of your household fleeing to avoid prosecution, custody or jail for a crime, or attempted crime, that is a felony?
- Are you or any member of your household violating a condition of probation or parole?
- Are you, or any member of your household, receiving Food Stamps and/or Temporary Assistance under another identity or as a member of another household or in another state?
- Have you, or any member of your household, been convicted in a federal or state court of a felony committed after 8-22-96 related to illegal possession, use or distribution of a controlled substance?

- Have you, or any member of your household, ever been convicted of fraudulently receiving duplicate Food Stamps and/or Temporary Assistance benefits in any state after 9-22-96?
- Have you or any member of your household been convicted of trading Food Stamp benefits for guns, ammunitions, or explosives after 9-22-96?
- Have you or any member of your household been convicted of trading Food Stamp benefits for drugs after 9-22-96?
- Does your household include a migrant or seasonal farm worker whose income has stopped and whose available cash and bank accounts do not exceed $100?
- Have any of your household members received Food Stamps from another state in the last 30 days?
- Has anyone of your household members received Medicaid, Supplemental Nursing Care, Blind Pension, Qualified Medicare Beneficiary or Specified Low Income Medicare Beneficiary benefits from another state in the last three months?
- Has anyone in your household received Temporary Assistance from another state in the last 30 days?
- Do any of your household members own or are they purchasing a prepaid burial plan?
- Are you and all members of your household residents of Missouri and do they intend to remain?
- Has anyone in your household age 16 to 60 quit a job in the last 60 days?

- Has anyone in your household age 16 to 60 reduced hours worked in the last 60 days?
- Does anyone in your household reside in a skilled nursing facility, intermediate care facility, residential care facility, institute for mental retardation, mental health center, psychiatric hospital or state rehab center?
- Does anyone in your household need in-home medical services?
- Do any of your household members own a car, truck or motor vehicle, or recreational vehicle?
- Do any of your household members own any real property/mobile home?
- Do any of your household members own business equipment, machinery, farm machinery, tools, farm grain or produce in storage, motor home, camper/trailer, boat/motor, aircraft or burial lots?
- Do any of the members of you household own or are they purchasing life insurance?

134. Many of these questions already appear on DSS's SNAP application form.

135. These automated questions must be answered before a caller seeking a SNAP interview is connected to a DSS staff member, but the answers are not captured for SNAP interview purposes or for any other use. The caller must answer the questions again once they are connected with a representative or, if the call is abandoned due to long wait times, when the caller tries again.

136. The questions serve no valid purpose. They simply extend the amount of time an individual must spend on the phone in pursuit of their SNAP benefits, and impose an additional barrier to accessing this essential program.

137. In addition to completing an interview, applicants for SNAP must submit certain verification documents. During the interview, DSS verbally informs applicants of any outstanding verifications. Following the interview, DSS sends applicants a written notice listing any necessary verifications.

138. If an applicant does not complete their interview, DSS never informs them of any needed verifications.

139. DSS has a Facebook page through which the agency disseminates information to the public. DSS has its Facebook posts set as open to public comment, and members of the public often use this forum to provide feedback to DSS regarding agency operations.

140. Complaints regarding the call center are common on DSS's Facebook page, and put DSS on notice that it is extraordinarily difficult for SNAP applicants to complete the required interview. For example, on November 30, 2020, DSS posted regarding the SNAP program. Numerous applicants replied to the post complaining that they could not complete their required interviews.

141. One reply reads "I called 45 times today it's like they are not answering calls at all I have been doing this every day for 30 days and now I will lose my benefits because today is the deadline. How can you demand that we call and then make us go crazy trying to get thru?" *See* Compl. Exhibit C, ECF 1-3.

142. Another reply reads "I have been trying for 3 weeks to get through to do my interview for my yearly food stamp renewal. I even finally got through to choose the callback option and was told it would be 17 minutes well that was 3 hours ago. My food stamps are going to expire soon through no fault of my own. What am I supposed to do about this?" *See* Compl. Exhibit D, ECF 1-4.

143. In response to a DSS post on November 17, 2021, one applicant wrote " . . . I have been calling or [sic] my interview for three month. Every month I have to reapply because I can never get through for my interview. The wait times are beyond ridiculous. The lowest time I've had to wait was 4 hours." *See* Compl. Exhibit E, ECF 1-5.

144. Missourians trying to access the SNAP program also replied to DSS's Facebook posts with complaints in January 2022.

145. One reply reads "[s]pent 4 hours on hold to do my interview just to get hung up on". *See* Compl. Exhibit F, ECF 1-6.

146. Another reply reads "[W]e try to set up an appointment for in person interview no one got back to us and no one is in the office of the county we live in no one will pick up the phone the voice mail is full. We put our app in from online we never got a call this whole this [sic] is just a joke." *See* Compl. Exhibit G, ECF 1-7.

**DSS's Processing Data Displays the Impact of Defendant's Harmful Policies**

147. DSS tracks the number of SNAP applications submitted, approved, and rejected each month. The agency also tracks the reasons why applications were rejected.

148. This data starkly displays the impact of Defendant's policies. In September, October, and December of 2021, more than 50% of rejected applications were denied because an interview could not be completed.

149. In addition, from July 2021 to December 2021, the number of SNAP enrollees *declined*—despite Missouri's termination of federal pandemic unemployment programs in May 2021, leading to fewer resources, and thus greater need for SNAP, for many Missouri households.

**Defendant's Lack of ADA Policies Designed to Provide Reasonable Accommodations Prevents Access to SNAP for Applicants with Disabilities.**

150. DSS is a public entity as defined by 42 U.S.C. § 12131(1).

151. Plaintiffs are qualified individuals with a disability, as defined in 42 U.S.C. § 12131(2).

152. Defendant routinely engages in discrimination against SNAP applicants with disabilities and other qualified individuals with disabilities, including Plaintiffs, in DSS's administration of the SNAP program.

153. Defendant has no publicly posted or accessible policies regarding the obligation of DSS to accord to SNAP applicants with disabilities the necessary reasonable accommodations they are entitled to under the ADA, in order to assist them in accessing benefits.

154. Because of Defendant's near-total reliance on the call center for SNAP operations, the only way for most applicants with disabilities to request a reasonable accommodation in the application process is via the call center.

155. As described in paragraphs 117-146, the call center is so overwhelmed as to be almost completely nonfunctional.

156. SNAP applicants with disabilities and other qualified individuals with disabilities in Missouri, including Plaintiffs, are routinely denied reasonable accommodations when trying to access SNAP through the call center or otherwise, because Defendant has made it effectively impossible for people to request reasonable accommodations at all.

157. As a result, Defendant subjects SNAP applicants with disabilities, including Plaintiffs, to discrimination in violation of the ADA by refusing them reasonable accommodations that would allow them to interact with the call center, bypass the call center, or interact with DSS staff in any other capacity as needed to complete the application process.

158. Defendant has further engaged, through operation of the call center, in methods of administration that have the effect of subjecting SNAP applicants with disabilities and other qualified individuals with disabilities, including Plaintiffs, to discrimination on the basis of disability that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of SNAP, with respect to those individuals, in violation of 28 C.F.R. § 35.130(b)(3)(i)-(ii).

159. Defendant has failed to establish a grievance procedure that can be used by SNAP applicants with disabilities and other qualified individuals with disabilities, as required by 28 C.F.R. § 35.107.

160. Defendant has failed to make publicly available, in violation of 28 C.F.R. § 35.106, information regarding the provisions of "the ADA and its applicability to the services, programs, or activities" of DSS regarding SNAP, including the rights of applicants with disabilities and other qualified individuals with a disability to reasonable accommodations necessary to access SNAP benefits and the right to protection against discrimination based on disability.

161. As a result of Defendant's actions, omissions to act, policies, practices and procedures, SNAP applicants with disabilities and other qualified individuals with disabilities are subject to unlawful discrimination under the ADA, by being denied an opportunity to participate in and benefit from SNAP.

**Plaintiff Mary Holmes**

162. Plaintiff Mary Holmes meets all of the statutory requirements to qualify for SNAP. The only barrier to her receipt of SNAP benefits is Defendant's failure to allow her to complete her interview.

163. Ms. Holmes tried to complete her SNAP application process for over a month, and was unable to do so due to the access barriers imposed by Defendant. Ms. Holmes only obtained SNAP benefits after filing this lawsuit against the Defendant, and after seeking a TRO.

164. Ms. Holmes cannot work, and her only income is a monthly SSDI payment. Her housing costs, electric bill, and phone bill use up most of this money.

165. Ms. Holmes has cancer and chronic obstructive pulmonary disease ("COPD"). She is a qualified individual with a disability as defined by 42 U.S.C. § 12131(2).

166. Ms. Holmes' COPD makes it difficult for her to carry out basic life activities. It often makes it difficult for her to breathe, especially during weather changes. Ms. Holmes often has to be admitted to the hospital due to her COPD, and she avoids leaving home whenever possible in order to avoid exacerbating her symptoms.

167. Symptoms related to Ms. Holmes' cancer make it difficult for her to speak.

168. As a result of her disabilities, Ms. Holmes is at heightened risk of severe complications from COVID-19.

169. Indeed, in late 2021 Ms. Holmes was hospitalized for approximately three and a half weeks with COVID-19 and pneumonia. She is still not fully recovered.

170. Until February 15, 2022, Ms. Holmes had a pay-per-minute cell phone. She does not have Internet access at home.

171. Ms. Holmes also lacks reliable transportation and must pay for rides.

172. Because of her disabilities, Ms. Holmes is very concerned about catching COVID-19 again. She goes out in public as little as possible, and wears a mask anytime she is around other people, including sometimes at home.

173. Ms. Holmes was receiving SNAP benefits until December 2021, when DSS sent her recertification paperwork to an old address at which she no longer resides.

174. During the first week of January, Ms. Holmes tried to call DSS on three separate occasions for help getting her SNAP benefits back. She could not reach anyone through the call center, nor could she request a new application form over the phone.

175. Ms. Holmes does not have Internet access and has limited phone access. She had no option but to go to a DSS office if she wanted to regain her SNAP benefits.

176. She had to pay a relative $10 for a ride in order to get to the office, where she risked COVID-19 exposure.

177. Ms. Holmes was entitled to and deprived of both a reasonable accommodation and the opportunity to request one.

178. Specifically, Ms. Holmes required a mechanism through which she could speak with DSS staff regarding her missed recertification paperwork and apply to receive SNAP again without entering a DSS office and risking exposure to COVID-19.

179. On January 10, 2022, Ms. Holmes went to the Chouteau resource center. When she arrived at the resource center, two DSS employees were working in the public area of the office, and approximately twelve people were waiting in line to be helped.

180. Most of the people waiting in line, including Ms. Holmes, wore masks. The two DSS employees did not.

181. Ms. Holmes waited in line for approximately twenty minutes before she spoke to the DSS employees.

182. Ms. Holmes explained that her SNAP benefits had been cut off because DSS sent her recertification paperwork to the wrong address. The employees told Ms. Holmes that she had

to reapply. They instructed Ms. Holmes to fill out a paper application available in the office and place it in the drop box.

183. Ms. Holmes filled out a paper application and placed it in the drop box as instructed.

184. While at the office, Ms. Holmes asked to complete her interview. DSS staff told her that they were not doing interviews that day and said that someone from DSS would call her in the next two or three days.

185. Ms. Holmes answered a call from DSS on or about January 12.

186. When she picked up the phone, a recording asked her the questions listed at paragraph 133 of this Complaint. Ms. Holmes had already answered many of these questions when she submitted her application.

187. After Ms. Holmes answered the questions, she was placed on hold and a recording stated that she was number 692 in line.

188. Ms. Holmes waited for four hours—and was charged by her phone provider for every minute of those four hours—but she was never connected with a DSS representative.

189. The next day, Ms. Holmes called DSS's call center once again to try to complete her interview.

190. The automated phone system asked her the same questions she had answered the day before. After completing the questions, Ms. Holmes was once again placed in a queue. A recording informed her that she was number 472 in line.

191. Ms. Holmes waited on hold for 2 hours on her pay per minute phone and was never connected with a representative.

192. The following day, Ms. Holmes called the call center once again to try to complete her interview. For the third time, she answered the series of automated questions, then was placed in a queue.

193. A recording informed her that she was once again 692 in line.

194. Ms. Holmes waited for approximately one hour, and was never connected to a DSS representative.

195. During the first week of February, Ms. Holmes received a notice in the mail from DSS titled "Interview Required to Process Your Application."

196. The notice said that an interview was needed to complete Ms. Holmes' SNAP application. This notice was the first time DSS communicated to Ms. Holmes a deadline to complete the SNAP interview.

197. Ms. Holmes tried to reach DSS several more times after she received the notice.

198. She called once per day on February 3, 4, 7, and 8. At the start of each call, she answered the automated questions and only then was placed in the queue. On all four days, there were more than 750 people ahead of her.

199. Ms. Holmes called the call center a final time on February 10. She answered the automated questions again, and was placed in the queue behind 468 other people. She had to hang up after approximately one and a half hours because she had no more prepaid minutes on her phone.

200. Most of the times Ms. Holmes called the call center during January and February 2022, the automated system played a message around 4:15 pm stating DSS was not doing any more interviews for the day and that she should to call back the following day, even though the call center is supposed to be open until 6 pm each day.

201. During the week of February 7, Ms. Holmes received a notice informing her that DSS had denied her January 10, 2022 SNAP application.

202. As a result of her disabilities, Ms. Holmes' financial situation is unlikely to improve, and she will likely continue to rely on SNAP to purchase food indefinitely.

203. Even if she regains her SNAP benefits, Ms. Holmes will have to continue to recertify her SNAP eligibility on a regular basis.[12] This will require her to navigate DSS's call center and attempt to be interviewed once again.

204. Despite diligent efforts and great expense, Ms. Holmes has been prevented by Defendant's policies from completing her interview.

205. Ms. Holmes was without SNAP benefits for more than a month when she filed this lawsuit.

206. Without SNAP, she is unable to buy food. For more than a month, she has been going hungry, and she will continue to do so without Court intervention.

207. She has to rely on help from friends and family and Food Outreach, a program that provides food to HIV and cancer patients. Neither provides enough food for her to eat a sufficient and healthy diet.

208. Because of Ms. Holmes' disabilities and lack of transportation, she cannot go to food banks very often. The food banks in her area are difficult to get to, and Ms. Holmes worries about catching COVID-19, since in her experience many of the people at the food banks do not wear masks.

**Plaintiff L.V.**

[12] *See* 7 C.F.R. § 273.10 (f).

209. Plaintiff L.V. meets all of the statutory requirements to qualify for SNAP. The only barrier to her receipt of SNAP benefits is Defendant's failure to allow her to complete her interview.

210. L.V. tried to complete her SNAP application for over a month, but could not do so because of the access barriers imposed by Defendant.

211. L.V. cannot work, and her only income is a child support payment. She is a single mother and has two children.

212. L.V. was diagnosed with COVID-19 in September 2021 and has ongoing symptoms, known colloquially as "long COVID." She also has diabetes. L.V. is a qualified individual with a disability as defined by 42 U.S.C. § 12131(2).

213. L.V.'s long COVID symptoms make it difficult for her to carry out basic life activities. She constantly struggles to breathe, and she relies on an oxygen tank. She also takes medication to manage a COVID-related heart condition that causes her heart rate to increase to a dangerous level when undertaking even the lowest exertion activities, such as walking to the bathroom or preparing food. L.V. suffers from near-daily migraines and extreme fatigue.

214. L.V.'s symptoms make it difficult for her to leave home.

215. L.V. lives on the second floor, and it is difficult for her to carry her oxygen tank up and down the stairs.

216. L.V.'s car is not working currently, and she must rely on a friend for rides.

217. In January 2022, L.V. was receiving SNAP benefits. She was due to complete her recertification application to continue receiving SNAP benefits.

218. L.V. submitted her recertification application to DSS via email on January 12, 2022.

219. On January 31, 2022, DSS called L.V., but she missed the call. A voicemail left on her phone instructed L.V. to call the call center to complete her interview.

220. L.V. called the call center soon after listening to the voicemail. An automated message informed her that the call center was at capacity, and the call ended.

221. L.V. called the call center once more on January 31, and again on February 1. Both times, she heard the message informing her that the call center was at capacity, and the call ended.

222. L.V. called the call center a fourth time on February 2, 2022. She answered the questions listed at paragraph 133 and was then placed in the queue and told that 322 people were ahead of her. She was never connected to a DSS representative.

223. Because of her long COVID symptoms, it is difficult for L.V. to find the energy to make numerous phone calls or sit on hold for extended periods of time.

224. L.V. was entitled to and deprived of both a reasonable accommodation and the opportunity to request one.

225. Specifically, L.V. required a mechanism through which she could complete her interview without having to make multiple phone calls and sit on hold for extended periods of time.

226. L.V.'s online account with DSS states that her SNAP benefits were terminated on January 31, 2022.

227. On January 31, 2022, L.V. received a notice titled "Interview Required to Process Your Application." The notice stated that she needed to be interviewed before DSS could process her SNAP application.

228. On February 5, 2022, L.V. received a notice in the mail dated February 1, 2022 informing her that if she did not complete an interview by January 31, her SNAP benefits would be denied.

229. On the same day, L.V. received a written notice informing her that her SNAP application had been denied. The notice said that her application had been denied because DSS was "unable to complete the interview."

230. Despite diligent efforts L.V. has been prevented by Defendant's policies from completing her interview.

231. As a result of her disabilities, L.V.'s financial situation is unlikely to improve, and she will likely continue to rely on SNAP to purchase food indefinitely.

232. L.V. only obtained an interview and had her SNAP benefit reinstated after this lawsuit was filed. Even though she regained her SNAP benefits, L.V. will have to regularly recertify her SNAP eligibility.[13] This will require her to navigate DSS's call center and attempt to be interviewed once again.

233. L.V. and her children were without their SNAP benefits for more than two weeks before this lawsuit was filed.

234. Without SNAP, L.V. cannot buy food. For weeks, she and her children have been going hungry, and they will continue to do so without Court intervention.

235. A friend gave L.V. a ride to the store on February 14, 2022 and bought her enough food for two meals. As of this filing, the only other food L.V. has in her home are canned goods and dry noodles left over from last month, when she still had SNAP benefits.

[13] *See* 7 C.F.R. § 273.10 (f).

236. L.V.'s children are sometimes able to eat at school. Their school serves breakfast and lunch every school day, but schools in her district are only open four days a week.

237. L.V.'s children's bus is often delayed. When the bus is delayed, the children do not arrive at school in time to eat breakfast before the school day begins.

238. The food L.V. has available to feed her children when they are not in school is not healthy. Without SNAP, she cannot afford to buy healthy food.

239. L.V. has to eat to manage her disabilities. Managing her diabetes requires that she eat regularly, and she takes medications for her long COVID symptoms that must be taken with food.

**Plaintiff Andrew Dallas**

240. Plaintiff Andrew Dallas meets all of the statutory requirements to qualify for SNAP. The only barrier to his receipt of SNAP benefits is Defendant's failure to accommodate his disabilities and assist him with the recertification process.

241. Mr. Dallas has been trying to complete his SNAP recertification application but has been unable to do so due to the Defendant's failure to provide a reasonable accommodation or a process to request a reasonable accommodation.

242. Mr. Dallas's only income is the $941 he receives per month in Supplemental Security Income and the $203 per month he receives in SNAP benefits.

243. Mr. Dallas does not have any savings.

244. Mr. Dallas is a qualified individual with a disability as defined by 42 U.S.C. § 12131(2).

245. Mr. Dallas has epilepsy which causes him to have frequent seizures. On average, he has one seizure per week, but at times where he is feeling particularly stressed, he will have them more frequently, sometimes as many as three times a week.

246. Many things in his day-to-day life can cause seizures including stress, a poor diet, skipping meals, and not getting enough sleep.

247. As a result of his frequent seizures, Mr. Dallas often feels confused. His seizures cause "brain fog" which can cause him to lose track of what he is doing including forgetting what he is talking about in the middle of a conversation. This brain fog has worsened over time and doctors have not been able to prescribe any treatment for it.

248. Mr. Dallas' epilepsy also makes it difficult for him to leave his home.

249. Because of his frequent seizures, Mr. Dallas is not able to drive and does not own a car. His home health aide does his grocery shopping.

250. Mr. Dallas relies on SNAP to buy his groceries. If his SNAP benefits do not last the entire month, he gets food donations from St. David's Catholic Church in Arnold, Missouri.

251. In January 2023, Mr. Dallas received recertification paperwork in the mail from the Missouri Department of Social Services (DSS). The letter informed him that he needed to recertify by February 28, 2023 or his SNAP benefits would end.

252. Due to his disabilities, Mr. Dallas is not able to complete the paperwork by himself.

253. Mr. Dallas finds the recertification papers complicated and confusing. The papers use terms that Mr. Dallas does not understand.

254. Mr. Dallas was entitled to and deprived of both a reasonable accommodation and the opportunity to request one.

255. Specifically, Mr. Dallas required a mechanism through which he could speak with DSS staff regarding his questions about how to complete his SNAP recertification.

256. On February 8 and 9, 2023, Mr. Dallas tried to reach the call center approximately 10 times to ask for help completing his recertification paperwork.

257. On at least three of his attempts, he was not able to get past the call center main menu's language selection prompts. Each time, Mr. Dallas heard a message instructing him to press 1 for English. He did so, and the language selection instructions repeated. When he pressed 1 for English once again, the call disconnected.

258. On one of his later attempts, he got past the main menu prompts and was put on hold. He was informed there were 234 callers ahead of him. After a little while, Mr. Dallas decided to hang up because he did not think he would be able to hold on until someone was able to get to him.

259. Mr. Dallas hoped someone from DSS would help him complete his form by talking to him over the phone and by explaining how to answer the questions he finds confusing.

260. Mr. Dallas is not able to easily travel to a local office to ask for help.

261. In order to travel to a resource center, he would have to pay a friend for gas to drive him or hire a cab. Paying someone to transport him to the resource center would be cost prohibitive.

262. Mr. Dallas also has difficulties walking and is at risk of falling.

263. Without a reasonable accommodation in the form of assistance from the agency, Mr. Dallas cannot complete and submit his SNAP recertification application. His eligibility for benefits will expire soon.

264. As a result of his disabilities, Mr. Dallas' financial situation is unlikely to improve, and he will likely continue to rely on SNAP to purchase food indefinitely

265. Even if someone were to help Mr. Dallas complete this recertification paperwork, Mr. Dallas will still have to regularly recertify his SNAP eligibility. This will require him to navigate DSS's call center and attempt to ask for help again. He will experience the same barriers he has already faced unless the Defendants corrects the problems with long wait times and disability accessibility.

266. Without SNAP, Mr. Dallas will not be able to afford enough food to survive. A poor diet and/or skipping meals will put his health at risk by risking triggering more seizures.

**Plaintiff Denise Davis**

267. Plaintiff Denise Davis meets all of the statutory requirements to qualify for SNAP. The only barrier to her receipt of SNAP benefits is Defendant's failure to allow her to complete her interview.

268. Ms. Davis has been trying to complete her SNAP application process for more than three months and has been unable to do so due to the access barriers imposed by Defendant.

269. Ms. Davis lost her job when her former employer went out of business in September 2022. She also has health conditions that have made her unable to work since October 2022. She has no income, no savings, significant medical debt, and she is currently homeless.

270. Ms. Davis is temporarily staying with a friend while waiting for an application for public housing to be processed.

271. Ms. Davis is a cancer survivor. She currently has a kidney condition, post-traumatic stress disorder, and depression.

272. Ms. Davis has submitted three separate SNAP applications and despite repeatedly calling DSS's call center, she has not been able to complete her interview. She is still without SNAP benefits today.

273. After Ms. Davis' employer went out of business and she lost her job, she submitted an initial SNAP application online in late 2022. She never received any communication about her application from DSS, so she called Defendant's SNAP information line. Ms. Davis was told by a DSS worker that there was no application registered under her Social Security number, and that she should reapply.

274. This was one of only two occasions where Ms. Davis was able to speak to a DSS representative, neither of which resulted in a completed SNAP interview.

275. In December 2022, Ms. Davis submitted a second online SNAP application. Soon after, she was hospitalized with acute kidney failure for two weeks. While hospitalized, she did not have access to her phone.

276. Once Ms. Davis was released from the hospital, she called the call center multiple times each week to complete her SNAP interview.

277. Each time Ms. Davis called the call center to be interviewed, there were hundreds of people ahead of her in the queue. On more than one occasion, more than 700 people were in the queue.

278. On more than one occasion, Ms. Davis waited between two and three hours until fewer than 100 people were ahead of her in the call center queue, but she heard a recording

informing her that DSS was receiving too many calls, and that she should call back later. Each time, the call was then terminated by the call center system.

279. In late January 2023, Ms. Davis answered a call from DSS.

280. When she picked up the phone, she was put on hold. A recording informed her she was in a queue behind 17 other people.

281. When Ms. Davis was connected to a DSS worker, the worker requested Ms. Davis' case number. Ms. Davis did not know her case number, so she supplied her Social Security number. The DSS worker accepted this information, but then hung up on Ms. Davis.

282. Ms. Davis called the number back immediately, but heard a recording that 300 people were waiting ahead of her in line.

283. Ms. Davis has a prepaid phone plan. The friend who she is staying with sometimes let Ms. Davis use her phone, which is on a contract, to call DSS so that Ms. Davis would not have to use up her minutes sitting on hold.

284. Ms. Davis also attempted to be interviewed via mechanisms other than the call center.

285. Ms. Davis called her local DSS office in Rolla, Missouri to schedule an appointment to be interviewed in person. Instead, she was transferred to the call center and placed in the queue once again.

286. On two occasions, Ms. Davis tried to use the DSSChat feature on Defendant's website to complete her SNAP interview. Each time, DSSChat directed her to the call center to complete her interview.

287. Ms. Davis was never given the option to leave her phone number and be called back.

288. In early January 2023, Ms. Davis received a notice from DSS informing her that she needed to complete her interview. Soon after, she received a second notice informing her that if she did not complete her interview by January 30, her SNAP application would be denied. Despite the efforts described above, Ms. Davis was not able to complete her interview, and her second SNAP application was denied.

289. In January 2023, Ms. Davis applied for SNAP a third time with the assistance of staff at Feeding Missouri, a nonprofit organization.

290. Ms. Davis has attempted to be interviewed via the call center approximately fifteen times since submitting her third SNAP application. Since filing this third application, she has never been connected to a DSS worker.

291. Once again, Ms. Davis received two notices from DSS—one informing her that she needed to complete an interview, and another telling her that if she did not do so by March 1, her SNAP application would be denied.

292. As a result of her health conditions, Ms. Davis' financial situation is unlikely to improve, and she will likely continue to rely on SNAP to purchase food indefinitely.

293. Even if she receives her SNAP benefits, Ms. Davis will have to continue to recertify her SNAP eligibility on a regular basis. This will require her to navigate DSS's call center and attempt to be interviewed once again.

294. Despite her diligent efforts, Defendant's policies have prevented Ms. Davis from completing her interview.

295. Ms. Davis has now been waiting for SNAP benefits for more than three months.

296. Without SNAP, she is unable to buy food. For months, she has been relying on food banks to eat. She currently has no other source of food.

297. The food banks distribute mostly processed food. Ms. Davis needs to eat a nutritious diet including fruits and vegetables in order to manage her kidney condition. She cannot do so when relying on food banks for food.

**Plaintiff Empower Missouri**

298. Empower Missouri is a not-for-profit organization, duly organized and existing under the laws of the State of Missouri. The organization is headquartered in Jefferson City, Missouri.

299. Empower Missouri conducts advocacy work in pursuit of two guiding principles: that all people in Missouri should have true access to adequate nutrition, quality healthcare, decent housing, and appropriate education; and all people in Missouri should be treated with dignity and fairness.

300. Empower Missouri's work is grounded in the belief that the State of Missouri should fully fund, fully implement, and/or fully supplement state and federal food assistance programs.

301. Empower Missouri works in partnership with direct services organizations, providing education and advocacy to and on behalf of community organizations regarding public benefits issues.

302. Empower Missouri operates across the State and has regional councils in both St. Louis and Kansas City to address issues particular to each respective city.

303. Empower Missouri devotes significant time, energy, and resources to issues arising from DSS's administration of Missouri's SNAP program.

304. Empower Missouri organizes advocates to address areas that relate to achieving basic fairness in Missouri and fulfilling the basic needs of Missourians.

305. Empower Missouri is the leading voice on anti-hunger in the state of Missouri.

306. The interests of Empower Missouri, as well as the interests of its partner organizations, are adversely affected by the actions and inactions of Defendant as alleged in this Complaint, and Empower Missouri has diverted significant organizational resources to counteract Defendant's practices.

307. Empower Missouri's budget for fiscal year 2022 anticipates spending more than $100,000 on anti-hunger work. This constitutes more than one-sixth of Empower Missouri's overall budget.

308. Empower Missouri is a founding member of the SNAP Advisory Group, which formed in 2021 in response to DSS's failure to properly administer SNAP. Since January 2022, the Advisory Group had held monthly calls with the Family Support Division of DSS regarding SNAP-specific issues. On these calls Empower Missouri advocates for policies and practices that would improve access to SNAP and other benefits.

309. Empower Missouri convenes the Food Security Coalition ("FSC"), a group of anti-hunger advocates and providers in Missouri. Through the FSC, Empower Missouri provides resources and information to anti-hunger advocates and providers, and communicates with DSS regarding agency failures in the SNAP program. Most members of the FSC are direct service providers including food banks and anti-homelessness organizations.

310. The FSC meets monthly when Missouri's legislature is not in session, and bimonthly when the legislature is in session.

311. Because of the numerous problems with DSS's administration of the SNAP program, Empower Missouri staff divert considerable time and effort organizing and managing the FSC.

312. Empower Missouri engages in legislative advocacy to ensure that SNAP is available to as many Missourians as possible.

313. Empower Missouri has surveyed SNAP recipients in Missouri in order to track and assess the effectiveness of the program from the perspective of recipients.

314. Empower Missouri advocates to DSS for policies and practices that better serve SNAP recipients. This includes conducting conference calls with advocates and DSS, sharing resources regarding effective SNAP program operations, and leading efforts to combat harmful practices embraced by DSS.

## STATEMENT OF CLAIMS

### FIRST CLAIM

315. Defendant's policies, practices, and procedures of wrongfully denying applicants for Missouri's SNAP program violate 7 U.S.C. § 2014(a), 7 U.S.C. § 2020(e)(2)(B), and implementing regulations 7 C.F.R. § 273.2(c)(1)-(3) and 7 C.F.R. § 273.2(f)(3).

### SECOND CLAIM

316. Defendant's policies, practices, and procedures of failing to ensure that Missourians are able to submit an application for SNAP on the first day that they contact the agency violate 7 U.S.C. 2020(e)(2)(B) and implementing regulations.

### THIRD CLAIM

317. Defendant's policies, practices and procedures deprive Plaintiffs of fair access to SNAP benefits by using an inaccessible call center for mandatory interviews, failing to provide notices, and subjecting otherwise eligible individuals to arbitrary denials of benefits in violation of the Due Process Clause of the 14th Amendment to the Constitution, made actionable by 42 U.S.C. § 1983.

## FOURTH CLAIM

318. Defendant's actions, omissions to act, policies, practices and procedures of failing or refusing to make reasonable accommodations available to Plaintiffs and other qualified individuals with disabilities, and engaging in methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of SNAP, prevents them from effectively exercising their rights to meaningful access to benefits, programs and services, and subjects them to unlawful discrimination in violation of the ADA and implementing regulations promulgated by the U.S. Department of Justice.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court enter judgment in favor of Plaintiffs as follows:

A. Assume jurisdiction of this matter;

B. Direct Defendant to provide Plaintiffs Holmes and L.V. with direct access to their required SNAP interviews within three working days, allow Plaintiffs time to submit such verification as may be necessary to complete the eligibility determination process, and render subsequent eligibility decisions documented on legally sufficient notices consistent with this process;

C. Declare unlawful Defendant's policies and practices of:

(1) Wrongfully denying initial and recertification applications for SNAP;

(2) Failing or refusing to allow households to apply for SNAP on the day they first contact the agency;

(3) Subjecting SNAP applicants to arbitrary and inconsistent application interview practices and procedures that result in wrongful denial of benefits;

(4) Excluding Plaintiffs from participation in the benefits, programs, services, and activities of Defendants, and denying Plaintiffs the benefits of these benefits, programs, services, and activities due to their disabilities and handicap, thereby subjecting Plaintiffs to discrimination in violation of Title II of the ADA and implementing regulations and Section 504 and implementing regulations; and

(5) Utilizing and adopting methods of administration that have the effect of subjecting the Plaintiffs to discrimination based on disability and handicap and defeating or substantially impairing the accomplishment of the objectives of Defendant's SNAP programs, with respect to the Plaintiffs, in violation of Title II of the ADA and implementing regulations and Section 504 and implementing regulations;

(6) Failing or refusing to adopt appropriate and adequate ADA and Section 504 grievance procedures that reasonably would allow Plaintiffs and other individuals with disabilities to file grievances and obtain relief when their rights under the ADA and Section 504 are violated, thereby preventing them from effectively having the opportunity to uphold their rights as persons with disabilities to meaningful access, with or without reasonable accommodations, to the SNAP program in violation of Title II of the ADA and implementing regulations and Section 504 and implementing regulations;

D. Preliminarily enjoin Defendant to maintain in-person DSS resource center operations sufficient to comply with the requirements of 7 U.S.C. § 2014(a) and 7 U.S.C. § 2020(e)(2)(B) of the SNAP Act, and implementing regulations, and Title II of the ADA.

E. Permanently enjoin Defendant to:

(1) Cease any closures, reduction of hours, and/or reduction of in-person staffing of DSS offices until such time as Defendant has adopted statewide and systemic policies to ensure that such closures and/or reductions do not result in the violation of the rights of SNAP applications under the SNAP Act, Section 504 and/or Title II of the ADA;

(2) Cease denying SNAP applications for eligible individuals who have not been provided by Defendant with a meaningful opportunity to complete the SNAP application process;

(3) Adopt, implement, and monitor statewide and systemic policies and procedures to ensure that all applicants for SNAP have a meaningful opportunity to complete a SNAP interview, required verifications, and all other elements of the SNAP application;

(4) Adopt, implement, and monitor statewide and systemic policies to ensure that all Missouri residents are provided with an opportunity to apply for SNAP on the first day that they contact DSS;

(5) Adopt, implement, and monitor statewide and systemic policies and procedures to ensure that applicants and recipients with disabilities are routinely provided with appropriate identification or screening as individuals with disabilities requiring reasonable accommodations to meaningfully access SNAP;

(6) Provide reasonable accommodations, as appropriate, to Plaintiffs to enable them to comply with SNAP application and eligibility requirements, and access and maintain their eligibility for these benefits;

(7) Adopt, implement and monitor statewide and systemic policies and procedures designed to notify SNAP applicants and recipients, with respect to the nondiscrimination requirements of Title II of the ADA and Section 504 and their applicability to these programs; and

(8) Adopt, implement and monitor an appropriate and adequate grievance procedure providing for prompt and equitable resolution of complaints of ADA Title II violations and Section 504 violations and provide adequate, reasonable notice to applicants for and recipients of DSS administered benefits, programs and services of their right to file grievances.

F. Retain jurisdiction over this action to ensure Defendant's compliance with the mandates of the Court's Orders;

G. Award Plaintiffs litigation costs and reasonable attorney's fees, pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12205 (ADA); and 29 U.S.C. § 794(a) (Section 504); and

H. Grant such other, further, or different relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Katherine A. Holley*
Andrew J. Scavotto, #57826
J. Nicci Warr, #59975
William R. Wurm, #68912

Zachary T. Buchheit, #71816
Joyce S. Kim, #72746
STINSON LLP
7700 Forsyth Blvd., Suite 1100
Clayton, MO 63105
(314) 863-8600
andrew.scavotto@stinson.com
nicci.warr@stinson.com
william.wurm@stinson.com
zachary.buchheit@stinson.com
joyce.kim@stinson.com

Katherine A. Holley #71939
Jamie L. Rodriguez # 64323
Lisa J. D'Souza # 65515
Legal Services of Eastern Missouri
701 Market St., Ste. 1100
St. Louis, MO 63101
(314) 534-4200
kaholley@lsem.org
jlrodriguez@lsem.org
ljdsouza@lsem.org

Katharine Deabler-Meadows*
Saima Akhtar*
National Center for Law and
Economic Justice
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
deabler@nclej.org
akhtar@nclej.org

**Admitted pro hac vice*