# EXHIBIT 18

CORE/9990000.8275/183195427.1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF MISSOURI

 3                  CENTRAL DIVISION

 4

 5   MARY HOLMES, L.V. and EMPOWER

 6   MISSOURI,

 7                  Plaintiffs,

 8   vs.

 9   ROBERT KNODELL, in his        Case No.

10   official capacity as Acting     2:22-cv-04026-MDH

11   Director of the Missouri

12   Department of Social

13   Services,

14                  Defendant.

15

16

17              *** CONFIDENTIAL ***

18

19        ZOOM VIDEOCONFERENCE DEPOSITION OF ANNA

20   WISE, a 30(b)(6) Witness, taken on behalf of the

21   Defendant before Laurel A. Woodbridge, Missouri CCR

22   No. 898 and Kansas CCR No. 1327, RPR, CSR, and CRR,

23   pursuant to Notice to Take Deposition on the 10th of

24   May 2023.

25
```

1  BY MS. DEABLER-MEADOWS:

2        Q.    Okay.  So just to make sure that I

3  understand, you reviewed documents that have already

4  been produced to Plaintiffs as part of the written

5  discovery process in this litigation?

6        A.    That's correct.

7        Q.    Okay.  And did you meet with an

8  attorney to prepare for today?

9        A.    Yes.

10        Q.    Okay.  Was that an attorney with DSS?

11        A.    Yes, as well as the AG's office.

12        Q.    Thank you.  And I am just now

13  realizing that I have not defined the acronym DSS, so

14  I'm just going to put on the record that DSS is the

15  acronym for Department of Social Services.

16             Is that all right with you?

17        A.    Yes.

18        Q.    I want to make sure we have a clean

19  transcript.

20             So other than counsel and human

21  resources and the human resources assistant, did you

22  meet with anybody else to prepare for today's

23  deposition?

24        A.    No.

25        Q.    What is your current job title?

1        A.      It's Office for Civil Rights Director

2   for the Missouri Department of Social Services.

3        Q.      And what are your job

4   responsibilities?

5        A.      My job responsibilities are to oversee

6   the Office for Civil Rights, which includes handling

7   complaints of discrimination involving the Department

8   of Social Services that are filed internally to the

9   Department of Social Services, and also handles the

10  complaints that are filed externally to other

11  agencies, whether that's federal or state agencies,

12  regarding discrimination matters involving the

13  Department of Social Services.

14              Also, I am the designated ADA

15  coordinator for the Department of Social Services, so

16  in that role I perform the job functions of the ADA

17  coordinator as it relates to accommodation for

18  services, but also do handle employee accommodations

19  and assist our division's human resource managers and

20  staff in handling employee accommodations as well.

21              I also handle other civil rights

22  matters for the Department of Social Services, assist

23  on policy, training as it relates to civil rights and

24  the ADA.

25              That's a brief summary of the duties.

1  trainings?

2        A.      Generally they're monthly, a monthly

3  training.

4        Q.      And the supervisors and managers, how

5  often do they attend those trainings?

6        A.      They're required to take what we call

7  the managing ADA training when they've been promoted

8  or hired to a supervisor or manager position, but it

9  is also open for any supervisor or manager to take

10  the course at any time of their choosing.

11       Q.      And have the materials for that

12  training course been produced in this litigation?

13              MR. HAYNES:  If you know, you can

14  answer.

15       A.      Okay.  Yes, I believe so.

16  BY MS. DEABLER-MEADOWS:

17       Q.      And who trains the employees who are

18  kind of down line from the supervisors and managers?

19       A.      Oh.  So for all DSS employees, they

20  receive civil rights and diversity training upon

21  hire, and then every three years thereafter is for

22  the frontline staff, and there's also a supervisor

23  and manager training.  And then specific to SNAP,

24  there is an annual training that is put out as it

25  relates to civil rights, which includes the ADA

1  accommodations.

2          Q.      Okay.  You say the training is put

3  out.  Are you the one conducting that training?

4          A.      So the civil rights and diversity

5  training, that is a virtual training that -- I do not

6  conduct that.  That is a team member in the human

7  resource center that conducts that training.

8                  And then the second training I

9  referred to, the specific to SNAP civil rights, that

10 is an online training.

11         Q.      Okay.  Do you have other job duties

12 that are not related to the ADA?

13         A.      Yes.

14         Q.      And do those other job duties, do they

15 all relate to civil rights compliance?

16         A.      Yes, there would generally be some

17 type of tie, you know, to that.  That is my main

18 focus.  I mean, some of it could be a little broader

19 human resources, but there's generally a tie to civil

20 rights.

21         Q.      On a monthly basis, what percentage of

22 your time is generally spent on ADA-related matters?

23                  THE WITNESS:  Can I ask a clarifying

24 question?

25                  MR. HAYNES:  If you don't understand

1    the question --

2              THE WITNESS:  Can I ask --

3    BY MS. DEABLER-MEADOWS:

4         Q.    If you don't understand, you can

5    always tell me.

6         A.    Well, actually, I just have a

7    clarification.  So are you meaning like as a whole as

8    far as employment and services?

9         Q.    Yes.  Let's start with that.

10        A.    Okay.  I would say -- oh, sorry, it's

11   kind of hard to estimate that because it can

12   fluctuate, like monthly obviously because

13   accommodations are case-by-case.  So it could

14   sometimes be 50 percent, but it could be lower than

15   that.  Maybe a range, 20 to 50 percent, maybe

16   sometimes a little higher than 50 percent.  Some of

17   that as it relates to employment if we've had changes

18   and different things like that, we can see an

19   increase in accommodation requests from our

20   employees.

21        Q.    And now let's break that down further.

22   What percentage of your time monthly do you spend on

23   ADA-related matters as relates to clients and members

24   of the clique?

25        A.    I would say that it's probably less

1    than 10 percent.

2           Q.    Okay.  Thank you.  And what is the

3    budget that is allocated to your office?

4           A.    I don't know.

5           Q.    Have you ever had discussions with

6    superiors about increasing funding for your work?

7                 MR. HAYNES:  I'm going to go ahead and

8    object.  I think budget is outside the scope of the

9    process that she's here to speak about as far as the

10   ADA.

11                But if you know the answer, by all

12   means.

13          A.    I don't.  I don't handle the budget.

14   That's why I answered "I don't know" to the other

15   one, because I don't -- I don't handle that piece --

16   BY MS. DEABLER-MEADOWS:

17          Q.    Okay.

18          A.    -- the budgets.

19          Q.    Oh, sorry.  Go ahead.

20          A.    No, sorry.  I was just clarifying I

21   don't handle the budget piece specifically.

22          Q.    Okay.  Okay.  And just so we're clear

23   going forward, if your attorney objects to one of my

24   questions, unless you're specifically instructed not

25   to answer, you can still answer.  There may be an

1    incident, you know, if your attorney feels that a

2    question I ask approaches attorney-client privilege,

3    he might instruct you not to answer.  But otherwise

4    we can just keep going once he's put his objection on

5    the record.

6                    How are DSS staff made aware that

7    you're the ADA coordinator?

8         A.     Through the training that was talked

9    about earlier, as well as that information is

10   available in our DSS nondiscrimination policy

11   statement, and so we have like a posting policy so

12   that information is shared with that.  And so if

13   there's an update to that, you know, employees are

14   responsible for being familiar with our

15   administrative manual.  But I would say primarily

16   through the training, and it is also posted in all of

17   our offices, for our employees as well as individuals

18   who come into our office, to see.

19        Q.     And other than that policy posting

20   that you were just talking about, how are clients and

21   other members of the public made aware that you're

22   the ADA coordinator?

23        A.     It is provided through our DSS

24   nondiscrimination policy statement that is available

25   on that posting in the offices, as well as on the DSS

1    website.

2          Q.     Okay.  Anywhere else?

3          A.     No, not that I can think of.

4          Q.     Okay.  We're going to introduce our

5    next exhibit which Sara will get loaded.  Let me know

6    when you can see it.  This is going to be marked as

7    DSS_Wise 2.

8              (Whereupon, Deposition Exhibit DSS_Wise

9               Number 2 was marked for identification.)

10         A.     I've reviewed the Exhibit 2.

11   BY MS. DEABLER-MEADOWS:

12         Q.     Okay.  So this is a provision from the

13   Code of Federal Regulations.  We've downloaded it off

14   of the CFR website.  I'm introducing it now for

15   reference, and we're going to look specifically at

16   Subsection -- sorry.

17              This is 28 Section 35.107 and we're

18   going to look at Subsection (a), which reads, "A

19   public entity that employs 50 or more persons shall

20   designate at least one employee to coordinate its

21   efforts to comply with and carry out its

22   responsibilities under this part, including any

23   investigation of any complaint communicated to it

24   alleging its noncompliance with this part or alleging

25   any actions that would be prohibited by this part.

1    managing ADA.

2         Q.    Okay.  Thank you.  And are staff

3    required to certify their knowledge of the

4    information contained in this training?

5         A.    They do, like, have to participate in

6    the training and they do sign off on our, like,

7    sexual harassment policy that is part of this

8    training.  So they do have to provide that

9    certification and, of course, participate for the

10   full six hours.  And the trainer who leads it, you

11   know, is ensuring that participation in the class.

12        Q.    Okay.  Is their knowledge of the

13   information in the training ever tested in any way?

14             MR. HAYNES:  I'll just go ahead and

15   object as to vague as to what you mean by "tested."

16             MS. DEABLER-MEADOWS:  Sorry, Tom,

17   could you speak up?

18             MR. HAYNES:  There it was.  Object to

19   the form.  It's a bit ambiguous as to what you mean

20   by "tested."

21             But if you understand the question, by

22   all means you can answer.

23             MS. DEABLER-MEADOWS:  I can clarify.

24   BY MS. DEABLER-MEADOWS:

25        Q.    Is there -- is there a quiz to

1  evaluate employees' knowledge after they take this

2  training?

3      A.    No.

4      Q.    All right.  Let's turn to the 14th

5  slide in this document.  And you should be able to

6  kind of type the number into the top of your screen

7  so we don't have to scroll forever, if that saves you

8  some time.

9           And let me know you're there.

10          MR. HAYNES:  Just for the sake of

11  making sure we're looking at the right thing, can you

12  give us what the title of the slide is or even the

13  Bates Number at the bottom.

14          MS. DEABLER-MEADOWS:  Sure.  The title

15  of the slide of DSS Commitment to Clients and

16  Applicants for Services and the Bates Stamp is

17  DEF 27269.

18          THE WITNESS:  I'm there.

19          MR. HAYNES:  As am I.

20  BY MS. DEABLER-MEADOWS:

21      Q.    Okay.  So on this slide, the fourth

22  bullet indicates that "DSS is committed to make

23  reasonable accommodations for qualified individuals

24  with known disabilities unless doing so would result

25  in an undue hardship."

1  they're working with, or they can contact myself as

2  the ADA coordinator.

3      Q.    And if an FSD worker suspects that an

4  individual has a disability, do they take any

5  affirmative steps?

6            MR. HAYNES:  I -- go ahead.  I object

7  to the form of the question.  I think it was -- I

8  don't think I understood the question, but if you

9  understood it.

10     A.    No.  Can you clarify what you're

11 asking, please?

12 BY MS. DEABLER-MEADOWS:

13     Q.    Sorry.  Let's use an example.  If --

14 let's say if a client comes into an FSD office to

15 apply for SNAP, and the FSD worker notices that the

16 individual is -- has a visual impairment, is that

17 worker trained to take any affirmative steps to

18 accommodate that individual's disability?

19            MR. HAYNES:  That has -- I'll go ahead

20 and object.  I think that's been asked and answered.

21            But you can answer.

22     A.    So again, we want to ensure that we

23 don't regard individuals as disabled.  Obviously, if

24 someone needs assistance, it's generally from the

25 individual asking for that.  Obviously, if it's an

1  obvious disability like -- you know, one, I think I

2  gave an example earlier, like if someone was

3  struggling coming into our office, obviously

4  providing assistance.  If it was obvious disability,

5  I believe you said vision impairment, they can ask

6  what assistance is needed.  Because again,

7  accommodations are individually based on what is

8  needed by the individual.

9  BY MS. DEABLER-MEADOWS:

10         Q.     Thank you.  If a client is receiving

11 SSI or SSDI, are FSD workers trained to do any sort

12 of affirmative outreach about whether that individual

13 might need an accommodation?

14         A.     Well, obviously we, like, have our

15 knowledge, like, of making our clients and applicants

16 for services aware, like how to request the

17 accommodation if needed, but it's not exactly the

18 same.  Like, obviously, there's components of -- like

19 the SSI, I believe you referred to, that could go to

20 their qualification for the benefits.  When we're

21 talking about reasonable accommodations as far as

22 assistance, so that they can have equal access to the

23 program.

24         Q.     And just to clarify, I am using SSI

25 and SSDI as potential indicators that this person is

1    likely disabled.  So if there is an indication in the

2    case file -- for example, if an individual is

3    receiving SSI -- that they are disabled, does FSD

4    take any affirmative steps to reach out and see if

5    that person might need additional assistance?

6         A.    Well, like I said, we're -- the focus

7    is always working with the individual to be able to

8    apply for the services as well as the assistance to

9    maintain those services, so they're having those

10   conversations.  So if it's like coming up, and

11   obviously they can notify them of the

12   nondiscrimination policy statement if some type of

13   assistance is individually needed for that individual

14   to be able to have access to the application,

15   etcetera.

16        Q.    If an individual has previously

17   received an accommodation, is that noted in their

18   case file?

19        A.    So, on accommodation, yes, it would

20   be -- should be noted in the case management system

21   for that individual person.  For the Family Support

22   Division and SNAP, it would be our FAMIS system.

23        Q.    And that's FAMIS, F-A-M-I-S; correct?

24        A.    That is correct.

25        Q.    Can those notes be accessed by other

1  making sure that commitment is met?

2       A.    So it would be like a joint

3  responsibility.  I mean, it is the expectation for

4  all of our DSS team members that they treat our

5  clients and applicants equitably, and obviously,

6  like, I have part of that role in that

7  responsibility.

8       Q.    Okay.  And how are staff trained on

9  this particular commitment?

10      A.    Right.  Through the training that I

11 have provided earlier, through the training that

12 we're referencing here, as well as like the USDA

13 civil rights training that's annually as it relates

14 to the SNAP program, as well as policy.

15      Q.    And that annual USDA training, is that

16 the same as the SNAP-specific annual training that

17 you've talked about earlier today?

18      A.    Yes.

19      Q.    Okay.  And are there any policies that

20 outline the specific commitment, other than those

21 you've already talked about?

22      A.    I don't believe I mentioned, like, we

23 have a DSS administrative policy 2-115 work rules.

24 That policy would also, you know, be applicable

25 there.

1    that you referenced earlier today, do FSD employees

2    receive any other training regarding the ADA as

3    members of the --

4            A.      I'm sorry.  You cut out on my end.  I

5    lost the very end of your statement.

6            Q.      Oh, I'm sorry.  Sure.  With -- setting

7    aside this training that we have in front of us as

8    Exhibit 3 and the USDA FNS training that you

9    referenced earlier today, do FSD employees receive

10   any other training regarding the ADA, specifically as

11   it relates to clients and members of the public?

12           A.      Supervisors and managers do receive

13   that managing ADA training that I referenced earlier.

14           Q.      Okay.  Anything else?

15           A.      No.

16           Q.      Okay.  Do any supplemental trainings

17   happen in local offices?

18           A.      They could.

19           Q.      Do you have knowledge of any

20   supplemental trainings happening in local offices?

21           A.      Not specific to the ADA.  I mean,

22   there could be some local training as it relates to

23   the SNAP program specifically, but that is given from

24   FSD.

25           Q.      If such trainings took place, would

1    need to be taking those courses.

2         Q.    Okay.  What mechanisms or paths does

3    FSD make available for applicants and recipients to

4    make reasonable accommodation requests?

5              MR. HAYNES:  Object to form as this

6    has already been asked and answered.

7              But you are free to answer again.

8         A.    Would you please restate the

9    beginning.  I'm sorry.  It's cutting out a little bit

10   out on my end, so I didn't hear the beginning.

11             MS. DEABLER-MEADOWS:  Oh, I'm sorry.

12             (Off-the-record discussion.)

13   BY MS. DEABLER-MEADOWS:

14        Q.    So what mechanisms or paths does FSD

15   make available for applicants or recipients of SNAP

16   to make reasonable accommodation requests?

17             MR. HAYNES:  Same objection.

18        A.    So as outlined by our DSS

19   nondiscrimination policy statement, it outlines that.

20   But anyone who needs auxiliary aid or service for

21   effective communication or modification to policy

22   procedure to have access to program services and

23   activities of the Department of Social Services

24   should notify DSS as soon as possible, but no later

25   than 48 hours of the scheduled event by notifying the

1  DSS local office or the DSS ADA coordinator, which is

2  myself.  So that's DSS as a whole, which includes

3  FSD.

4  BY MS. DEABLER-MEADOWS:

5         Q.     I'm just going to break that out a

6  little bit.  Can SNAP participants make reasonable

7  accommodation requests in writing?

8         A.     Yes.

9         Q.     Can they do that via U.S. mail?

10        A.     Yes.

11        Q.     Can they fax in reasonable

12 accommodation requests?

13        A.     Yes, they could.

14        Q.     And can they email them in?

15        A.     Yes.

16        Q.     And if a SNAP participant were going

17 to make a reasonable accommodation request in

18 writing, where would they send it?

19        A.     So the information is listed as the

20 ADA coordinator, so it does have the mailing address

21 for the Office for Civil Rights, so they could mail

22 it there.

23               Also, as stated, if they can make it

24 to the local office, so if they did have the local

25 office's address, they could mail it there.

1    Obviously, the main address that's listed is the

2    Office for Civil Rights.

3           Q.    Okay.  So that would come to your

4    office if they were using the address that's supplied

5    on -- on your public notices regarding the ADA?

6           A.    Yes.

7           Q.    How many written reasonable

8    accommodation requests has your office received in

9    the past year?

10                MR. HAYNES:  I'm going to go ahead and

11   object as to this is a bit vague.  Are you talking

12   about all of DSS?  Are you talking about FSD?

13   Specific to --

14                MS. DEABLER-MEADOWS:  I will rephrase.

15   BY MS. DEABLER-MEADOWS:

16          Q.    How many reasonable accommodation

17   requests has your office received in writing

18   regarding SNAP in the past year?

19          A.    I don't believe any.

20          Q.    Okay.  How many written reasonable

21   accommodation requests have various FSD offices

22   received -- or, sorry, strike that.

23                How many written reasonable

24   accommodation requests has FSD received regarding

25   SNAP in the past year?

1          A.      I don't know the number.  DSS does not

2   have like a separate tracking system as indicated and

3   discussed earlier.  A request for accommodation would

4   go specifically in the individual case in FAMIS for

5   the applicant or client for service.

6          Q.      Okay.  So there's no -- there's no

7   separate log outside of FAMIS for an accommodation

8   request; correct?

9          A.      That's correct.

10          Q.      And those written accommodation

11   requests, if they're sent to FSD, they would not

12   automatically be forwarded to your office; correct?

13          A.      No.  I mean, they -- if they can be

14   handled just as far as like the process that we

15   talked about earlier, they can be handled at the

16   local office.  And they receive that request, you

17   know, they can provide that accommodation directly to

18   that client or applicant for services.

19          Q.      Does DSS have a form for reasonable

20   accommodation requests?

21          A.      No.

22          Q.      Okay.  Okay.  I'm going to introduce

23   DSS_Wise Exhibit 4.  Let me know when you can see

24   that in the exhibit share.

25              (Whereupon, Deposition Exhibit DSS_Wise

1          Number 4 was marked for identification.)

2          A.     All right.  I have Exhibit 4.

3     BY MS. DEABLER-MEADOWS:

4          Q.     So this is an excerpt from Plaintiff

5     Andrew Dallas' case file which was produced to

6     Plaintiffs in written discovery.  The beginning Bates

7     Number for this excerpt is DEF 0138026, and we are

8     going to go to the second page, 0138027.

9          A.     Yeah.

10         Q.     Are you on the second page?

11         A.     I am on the second page.  Thank you.

12         Q.     Okay.  So we're going to look at --

13    there's handwritten text on this page that I --

14    again, it is handwritten, but what I read it to say

15    is "I have epilepsy and cannot understand like normal

16    people do.  Please help.  I am not sure I understand

17    all of the letter.  I am disabled."  And this is

18    written at the end of what looks like a food stamp

19    change report form.

20              Would this handwritten note on this

21    change report form, does that qualify as a reason --

22    a written reasonable accommodation request?

23              MR. HAYNES:  I'm going to object to

24    the extent that calls for a legal conclusion.

25              But if you have an answer.

1          A.     It is a request that this individual

2     needs assistance.

3     BY MS. DEABLER-MEADOWS:

4          Q.     Okay.  Under DSS policy, does this

5     handwritten note qualify as a reasonable

6     accommodation request?

7          A.     Yes.  I mean, it indicates that the

8     individual needs assistance with understanding this

9     letter that's put in there, and it's indicated that

10    the individual identifies that they're disabled.

11         Q.     Okay.  And was Mr. Dallas provided

12    with the accommodation?

13         A.     I can't -- I can't speak to that at

14    this time.

15         Q.     Okay.  What does DSS policy dictate

16    that an FSD worker receiving this handwritten note

17    should do next?

18         A.     I'm going to take a moment to read the

19    rest of the exhibit, if that's okay.

20         Q.     Sure.  Go ahead.  Yep.

21         A.     Thank you.

22                I've had a chance to review it.  Would

23    you please repeat the question.  Thank you.

24                MS. DEABLER-MEADOWS:  Laurel, could

25    you read that back, please.

1          (Whereupon, the requested portion of the

2           record was read by the reporter, as follows:

3           "QUESTION:  What does DSS policy dictate that

4           an FSD worker receiving this handwritten note

5           should do next?")

6                    THE WITNESS:  Thank you.

7                    So this is a change report, so

8     obviously FSD would be, you know, working to process

9     that.  Obviously, if there was questions and

10    assistance needed.  They would be contacting the

11    individual as it relates to that specific form and

12    what other information was needed, if it was not

13    already included.

14    BY MS. DEABLER-MEADOWS:

15         Q.    Okay.  Would -- if there wasn't a

16    problem change report, if the change report, as far

17    as the worker could tell, looked fine, does DSS

18    policy dictate that they should reach out to follow

19    up about the accommodation request?

20         A.    So if there was nothing else needed

21    and it was completed, because obviously at the

22    bottom, it indicates like "I hope I have it

23    completed," no, if everything was there, I don't

24    believe it would dictate, because this individual has

25    access to the, you know, reporting form, the change

1  sort of outreach should occur?

2      A.    Obviously, it would -- could be a best

3  practice, but obviously if we had the information

4  necessary for the benefits to keep incurring, it

5  wouldn't have to.  Obviously, it would be a best

6  practice to follow up with Andrew Dallas.

7      Q.    Okay.  So you just referenced a best

8  practice.  Are there best practices written down

9  anywhere in regards to ADA compliance?

10      A.    No.  I mean, I -- our -- as I stated

11  in our DSS nondiscrimination policy statement, like

12  that guides our accommodation policy for services, so

13  no separate best practices.

14      Q.    Okay.  So nothing outside of that

15  specific policy statement?

16      A.    Correct.

17      Q.    Okay.  Okay.  We're going to introduce

18  DSS_Wise Exhibit 5.  Let me know when you can see

19  that.

20            MS. LUNDEN:  I apologize.  Can you

21  tell me which exhibit, what Bates Stamp?

22            MS. DEABLER-MEADOWS:  Oh, sure.

23  Sorry, Sara.  It is 0138028.

24            MS. LUNDEN:  01380....

25            MS. DEABLER-MEADOWS:  0138028.

1    "I was contacted, this person needs to be contacted

2    related to their SNAP benefits."  If we have the

3    specific benefits known, "Please contact them back."

4              And in that situation, I would

5    generally say, "Could you just send me an update of

6    action taken in case they call the OCR 800 line

7    back."  But I generally always give the individual

8    our number if they have any questions or they haven't

9    heard from somebody, to always reach back out to this

10   number specifically so we can get them the assistance

11   needed.

12   BY MS. DEABLER-MEADOWS:

13        Q.    Okay.  So if the individual has been

14   connected with staff at DSS customer -- or, sorry, at

15   FSD customer relations and your office has connected

16   them to a person at FSD customer relations, do you

17   all do any follow-up with FSD customer relations to

18   see how the reasonable accommodation request was

19   ultimately concluded?

20        A.    Generally no.  That staff, you know,

21   handles the questions and what's needed for that

22   individual as it relates to -- we're talking SNAP --

23   excuse me, SNAP benefits here, answering those

24   questions and, you know, going over the relevant

25   information for them.  So we would just provide what

1    was needed to them and then let them handle what's

2    needed as far as the SNAP benefit perspective with

3    that individual, the client/applicant for services,

4    directly.

5          Q.    Okay.  So let's return to Mr. Dallas.

6    So we've looked at a couple of notes that Mr. Dallas

7    wrote to FSD regarding his disability, and we've

8    looked at his complaint allegations regarding his

9    attempts to receive a reasonable accommodation in

10   relation to his SNAP recertification.

11               Under current DSS policies, will

12   Mr. Dallas need to make a reasonable accommodation

13   request again if he needs assistance with other SNAP

14   paperwork?

15         A.    Yes, I believe so because he was --

16   specifically like the -- you're referencing the prior

17   exhibit that I reviewed, indicated he didn't quite

18   understand the specific letter, so obviously, if

19   assistance was needed with some other written

20   correspondence, I don't know what that would

21   specifically be, what would the questions be.  You

22   know, obviously someone contacting Mr. Dallas to

23   assist him with the specific questions related to the

24   correspondence that he now receives.

25         Q.    Is there any DSS policy or procedure

1    accommodation as quickly as possible if we're able to

2    meet the need of the client at the local office and

3    it doesn't create that undue hardship.

4                    So, I mean, that's the steps.  If they

5    come in and ask for assistance, you know, our FSD

6    team members are looking to provide that assistance.

7    If the frontline team member has any questions,

8    obviously they've got the resource of speaking with

9    our supervisors and managers as appropriate.

10                    And again, in the -- if they're able

11   to, is making that request at the local office,

12   because obviously that is our goal is, you know, to

13   provide assistance when needed if we're able to do so

14   so individuals can apply for the SNAP program as well

15   as to have, like, continued benefits.

16   BY MS. DEABLER-MEADOWS:

17        Q.    Okay.  So just to make sure that I'm

18   clear, frontline workers have the authority to

19   unilaterally grant reasonable accommodation requests;

20   is that correct?

21        A.    I mean, they're generally probably

22   going to speak to their supervisor or manager, but

23   like, for example, if it was a sign language

24   interpreter, like that request is -- you know what I

25   mean, can be provided at the local office, so they

1  could utilize our contracts to set up that sign

2  language interpreter.

3            As I said, most often, they're

4  probably working in coordination with their

5  supervisor or manager, but if that frontline staff,

6  you know, could make it, like you said, with my

7  example, the sign language interpreter, you know,

8  they could contact our sign language interpreter

9  providers and get that set up for that individual.

10       Q.    Okay.  Do frontline workers have the

11  authority to unilaterally deny reasonable

12  accommodation requests?

13       A.    As outlined in our process, is like

14  when it's requested, they should document it, like

15  speak to supervisors and managers if necessary, if

16  they're unsure whether they should approve the

17  request or they believe that the request should be

18  denied, then that should get escalated through their

19  supervisor and managers and they come to my

20  attention.

21       Q.    Okay.

22       A.    So the answer would be no.

23       Q.    Okay.  So do all -- under DSS policy,

24  do all accommodation requests that a frontline worker

25  needs to deny ultimately reach your office?

1          A.     The answer would be no because

2    obviously, if they can work with the supervisor or

3    manager, like if that supervisor or manager feels

4    like that they can approve it and meet it at the

5    local level, then that request for accommodation

6    could be made.  But obviously if there is, like,

7    going to be a denial of the request, like I should be

8    contacted because, as I stated earlier, if we can't

9    provide the requested accommodation, we do look to

10   see if there's alternative accommodations that could

11   be provided.

12          Q.     So is there any scenario in which a

13   reasonable accommodation request would be denied --

14   sorry, strike that.

15                 Is there any circumstance in which a

16   reasonable accommodation request made of FSD would be

17   denied without it reaching you or someone who reports

18   to you?

19                 MR. HAYNES:  Object to the extent it

20   calls for speculation and just the entire universe of

21   possibilities.

22                 MS. DEABLER-MEADOWS:  I can rephrase.

23   BY MS. DEABLER-MEADOWS:

24          Q.     Do frontline workers or managers have

25   the authority to deny reasonable accommodation

1    requests without your involvement?

2          A.     No.

3          Q.     Okay.  Does anyone other than you

4    review denials of reasonable accommodation requests?

5          A.     No, it'd be myself as the ADA

6    coordinator as it relates to services in the SNAP

7    program that we're talking about.

8          Q.     Okay.  Are there formal standards or

9    criteria for assessing whether to grant or deny a

10   reasonable accommodation?

11                MR. HAYNES:  Objection as it's already

12   been asked and answered.

13                MS. DEABLER-MEADOWS:  Let me clarify.

14   BY MS. DEABLER-MEADOWS:

15         Q.     Other than the undue hardship analysis

16   that you had outlined previously?

17                MR. HAYNES:  Same objection.

18         A.     No, I mean, accommodations are

19   reviewed on a case-by-case basis to make that

20   determination whether we can meet the need of the

21   individual or if it creates an undue hardship.  And

22   then again, as I stated, if we're not able to provide

23   that specific accommodation, we would look to see

24   what accommodations we could provide.

25   BY MS. DEABLER-MEADOWS:

1    Office of Civil Rights in the past year?

2             MR. HAYNES:  And I'll object to that,

3    as rephrased, as asked and answered.

4         A.    I don't recall any in the past year.

5    BY MS. DEABLER-MEADOWS:

6         Q.    Okay.  This slide also had a text that

7    reads, "Approve the request if you are able to meet

8    the needs of the client/applicant at the local office

9    and the request does not create an undue hardship."

10   Do frontline workers receive any specific instruction

11   on what constitutes an undue hardship?

12        A.    So through the training and stuff like

13   that, and so obviously the focus on is if they can

14   meet the need of the client in the local office, then

15   that accommodation request should be met.  And so if

16   they believe it would create an undue hardship,

17   that's when they should work with their supervisor,

18   that chain of command that's written in here,

19   supervisors or managers, as I referred to, and then

20   if necessary they could contact myself as the ADA

21   coordinator.

22        Q.    Okay.  When a reasonable accommodation

23   request does need to be run up the chain of command

24   and ultimately referred to your office, the Office of

25   Civil Rights, are there -- are there policies around

1  the timeline for how long it should take to grant or

2  deny the request?

3      A.    No.

4      Q.    So if a SNAP applicant or participant

5  is up against a deadline for turning in -- for

6  completing their application process or for

7  submitting a form and the reasonable accommodation

8  request cannot be granted before that deadline has

9  run, are any steps taken to ensure that that person

10  isn't deprived of benefits?

11          MR. HAYNES:  Objection to the extent

12  this calls for speculation.

13  BY MS. DEABLER-MEADOWS:

14      Q.    Does DSS policy dictate that any

15  steps be taken to make sure that there isn't an

16  interruption or deprivation of benefits?

17      A.    Well, obviously the request would be

18  like escalated, you know, in -- you know, as quickly

19  as possible, obviously, with that.  I can't speak to

20  whether, like, there would be a change in the benefit

21  or not.  I don't know the reason why the SNAP

22  benefits wouldn't continue.  Obviously, if after

23  working through the process and the information was

24  provided, obviously there can be, you know, a change

25  to the benefits if appropriate, but I can't answer

1    trying to understand the scenario, because I believe

2    we would be able to provide the accommodation to

3    assist Mr. Dallas with going over the information on

4    the certification form that was referenced earlier.

5    So I don't know why the accommodation wouldn't have

6    been able to be provided.  If that individual that

7    they were speaking to needed assistance, they could

8    have contacted a supervisor or manager.

9              Q.    Okay.  Is there a DSS policy that

10   provides for staying or tolling SNAP deadlines while

11   a reasonable accommodation request is  being

12   processed?

13             MR. HAYNES:  I'll object to the extent

14   that calls for a legal conclusion, but within SNAP

15   policies.

16             Go ahead.

17             A.    No.

18   BY MS. DEABLER-MEADOWS:

19             Q.    Okay.  So earlier today we talked a

20   little bit about undue hardship, and I believe you

21   used the phrase "fundamental alteration" as well.

22   What is your understanding, as ADA coordinator, of

23   the relationship between those two terms?

24             MR. HAYNES:  I'm going to object

25   because I don't think I understand the question.

1    reports to you ever undertake affirmative efforts to

2    ensure that the call center is complying with the

3    ADA?

4          A.    Well, obviously, as indicated, like if

5    there was, you know, any type of complaint or concern

6    that was brought forward, I would review and address

7    those when appropriate.  Obviously if someone

8    contacted the Office for Civil Rights on our 800

9    line, you know, and follow-up was needed as it

10   relates to the call center, you know, I'd review and

11   take appropriate action.

12         Q.    Okay.  Have you or anyone who reports

13   to you ever undertaken, like, a secret shopper

14   program as to the call center where someone calls in

15   and tries to make an accommodation request just to

16   see what happens?

17         A.    No, I have not.

18         Q.    Okay.  Have you ever recommended any

19   policy changes to improve FSD's compliance with the

20   ADA?

21         A.    Not that I can think of at this time.

22               MS. DEABLER-MEADOWS:  I'm going to

23   introduce another exhibit, Sara.  This is going to be

24   the second interrogatories.

25               MR. HAYNES:  We're not able to hear.

1            A.      That would be correct.  Like even

2    myself, like I answer it if I'm available.

3            Q.      Okay.  Thank you.  And if a reasonable

4    accommodation request came in to the Office for Civil

5    Rights and one of your staff members answered the

6    call and they thought that it might need to be

7    denied, do they have the authority to do that

8    unilaterally?

9            A.      No.  They would contact myself.

10           Q.      Okay.  All right.  Thank you.

11                   I'm going to introduce another

12   exhibit, which is going to be DSS_Wise Exhibit 7.

13                   MS. DEABLER-MEADOWS:  And, Sara,

14   that's going to be 31792.  And let me know when you

15   all can see that.

16                (Whereupon, Deposition Exhibit DSS_Wise

17                 Number 7 was marked for identification.)

18                   THE WITNESS:  We can see it on our

19   end.  Thank you.

20                   MS. DEABLER-MEADOWS:  Thanks.  Okay.

21   BY MS. DEABLER-MEADOWS:

22           Q.      Do you recognize this document?

23           A.      I do.

24           Q.      And what is this document?

25           A.      It's the DSS nondiscrimination policy

1   statement.

2         Q.    Okay.  And is that -- is this the

3   nondiscrimination policy statement that you've been

4   referring to throughout the day today?

5         A.    Yes, I have.

6         Q.    Okay.  Is this the current version of

7   this document?

8         A.    No.  We do have one that has been

9   updated after this one.

10        Q.    Okay.  And when was that update done?

11        A.    I believe August of 2022.

12        Q.    And has that updated version been

13  produced?

14        A.    I'm not sure.

15              MS. DEABLER-MEADOWS:  Sorry, Tom, if

16  we were meant to hear that, I could not.

17              MR. HAYNES:  To my knowledge, it's

18  been produced.

19              MS. DEABLER-MEADOWS:  Okay.

20  BY MS. DEABLER-MEADOWS:

21        Q.    And what are the -- what changed in

22  the version subsequent to this one?

23        A.    I believe what had -- what was updated

24  is we updated the USDA information within the

25  nondiscrimination policy statement.  When USDA FNS

1    question was; is that correct?

2    BY MS. DEABLER-MEADOWS:

3         Q.    Yes, that's correct.  Thank you.

4               Do you receive documentation of

5    reasonable accommodation requests that you are not

6    personally involved in?

7         A.    Would you just please repeat the

8    question?

9         Q.    Do you receive documentation of

10   reasonable accommodation requests that you are not

11   personally involved in?

12        A.    I would say generally no.  Obviously

13   the exception that I can think of is like if there

14   was some type of complaint and the Office for Civil

15   Rights was conducting an investigation, like we would

16   receive relevant documentation.  That's the capacity

17   I can think of.

18        Q.    Okay.  Do you keep any tabulation of

19   reasonable accommodation requests?

20        A.    No.

21        Q.    And for the subset of ADA reasonable

22   accommodation requests that you do review, do you

23   keep a log?

24               MR. HAYNES:  I'm going to go ahead and

25   object.  This has been asked and answered several

1    times now.

2            A.      No.

3    BY MS. DEABLER-MEADOWS:

4            Q.      I believe you testified earlier today

5    that if a reasonable accommodation request was denied

6    or if an alternative accommodation was insufficient,

7    the individual who made the request could appeal; is

8    that correct?

9            A.      Well, they can always contact me as

10   the ADA coordinator, if that's what you mean by

11   "appeal."

12           Q.      Okay.  That was going to be my next

13   question.  So if an accommodation is denied, you just

14   said they could contact the ADA coordinator, which is

15   you.  Does that constitute an appeal?

16                   MR. HAYNES:  Go ahead.

17                   Object to the extent that you are

18   calling for a legal conclusion there.

19                   But again, if you have an answer, go

20   ahead.

21           A.      Well, obviously, like -- I don't --

22   they can contact me.  If they wanted to appeal it,

23   they could contact me.  Obviously, they could always

24   contact me, like we've already talked about before,

25   like on denying an accommodation.  Generally our team

1  members, as stated previously, would contact me or

2  their supervisor or manager, but you're talking

3  specifically about an individual.  They could contact

4  me if they believed they were denied an accommodation

5  at the local office.  And an appeal --

6  BY MS. DEABLER-MEADOWS:

7        Q.    And if -- I'm sorry.  Go ahead.

8        A.    Sorry.  I was just trying to finish

9  your statement about appeal.  It wouldn't have to be

10  called an appeal.  They could obviously contact me as

11  the ADA coordinator.

12        Q.    Okay.  And if you denied a reasonable

13  accommodation request, would there be a mechanism for

14  the individual to appeal that denial?

15              MR. HAYNES:  Object to the extent it

16  calls for speculation.

17              Go ahead and answer.

18        A.    Oh, I'm sorry.  I was --

19              MR. HAYNES:  Always go ahead and

20  answer unless I tell you otherwise.

21        A.    No, I mean, not with -- like in the

22  Department of Social Services, obviously individuals

23  can go to the USDA.

24  BY MS. DEABLER-MEADOWS:

25        Q.    Okay.  So if an -- just to make sure

1  talk about that individuals can file a complaint with

2  USDA.

3          Q.      Okay.  And I know we already talked

4  about the nondiscrimination policy statement being

5  posted in local offices and being available on the

6  website.  Is that document ever mailed out to SNAP

7  recipients or applicants?

8          A.      The DSS nondiscrimination policy

9  statement specifically, no.

10          Q.      Okay.  Are other nondiscrimination

11  policy documents ever mailed to SNAP recipients or

12  applicants?

13          A.      Well, the USDA FNS nondiscrimination

14  policy statement would be provided in some documents,

15  like with the notices --

16          Q.      Okay.

17          A.      -- excuse me, I say documents.  The

18  notices in regards to the SNAP program.

19          Q.      And this would be the -- you're

20  talking about like a nondiscrimination statement

21  that's kind of included in block text at the bottom

22  of a notice?

23          A.      That's correct.

24          Q.      Okay.  Thank you.  Okay.  I'm going to

25  go introduce another exhibit.  It will be

1        Q.      Okay.  Thank you.  Do I understand

2    correctly that you and your staff members are the

3    workers at DSS that are making decisions on

4    disability discrimination complaints as to SNAP?

5        A.      Could you please repeat the question?

6        Q.      Yes.  Sorry.  That was very -- I will

7    rephrase.  That was very convoluted.

8              Do I -- is it correct to say that you

9    and your staff members are the only employees at DSS

10   that are deciding the outcomes of SNAP complaints

11   relating to disability?

12       A.      As it relates to, like, SNAP

13   disability discrimination complaints, yes, it's the

14   Office for Civil Rights who handles that.

15       Q.      Okay.  Do you have any written

16   standards that you use in deciding complaints?

17       A.      No.

18       Q.      Okay.  So you just stated that the

19   terms "grievance" and "complaint" are used

20   interchangeably as to SNAP disability complaints

21   and -- strike that.

22              You indicated that the term

23   "complaint" and "grievance" are used interchangeably

24   within DSS.  So does that mean that all grievances

25   that you have received since January 2019 would