# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

MARY HOLMES, DENISE DAVIS,
ANDREW DALLAS, and EMPOWER
MISSOURI,

                                            Plaintiffs,

                *-against-*

ROBERT KNODELL, in his official capacity
as Acting Director of the Missouri Department
of Social Services,

                                  Defendant.

No. 2:22-CV-04026

## ORDER

Before the Court are cross motions for summary judgment. (Docs. 137 and 139). On January 29, 2024, counsel presented oral argument on the pending motions. The parties agree that this case should be decided on the briefing. Plaintiffs contend that Defendant has failed to administer the Supplemental Nutrition Assistance Program ("SNAP") in compliance with the provisions of federal law and the on demand waiver requirements. Plaintiffs allege Defendant has failed to provide timely, accurate, and fair service to applicants for, and participants in, the SNAP program as required by federal law. See 7 U.S.C. § 7 U.S.C. § 2020(e)(2)(B)(i) ("a State agency…shall provide timely, accurate, and fair service to applicants for, and participants in, the supplemental nutrition assistance program"). Plaintiffs also argue Defendant has violated the requirements of the ADA in its administration of SNAP. The Court has reviewed the record before it, and for the reasons set forth herein, the Court rules in favor of Plaintiffs and against Defendant.

1

As more fully detailed throughout this Order, the evidence is undisputed that the telephone system utilized by DSS to handle SNAP applications is overwhelmed. The evidence reflects unacceptable wait times and thousands of calls that cannot be completed. For example, in July 2023 the average time a caller waited in the queue before speaking with a representative was over fifty minutes, and much longer wait times have been experienced. There are between 200 and 300 Call Center staff that work on different tasks, including Tier 1 and Tier 3 calls, appointments, online chat, and texts. In the first few months of 2023, DSS, on its own evaluation, found that approximately 400 staff totally dedicated to the Call Center, with no other duties apart from handling Tier 3 calls, would be required to meet the private call center industry standard which is to answer 80% of calls within 2 minutes.

Thirty two percent of all calls that made it to the Tier 3 queue, which handles SNAP interviews and applications, were abandoned by the caller before being connected to a Call Center employee. In July 2023, 64,053 calls were deflected from the Tier 3 queue. While the Call Center was open until 6:00 p.m. from January 2023 to June 2023 the Call Center routinely started deflecting calls by 2:00 p.m. In 2023, almost 60,0000 applications (initial and recertification) have been denied for failure to complete an interview. In addition, fifty percent of applications were denied for failure to complete the interview in one month during 2023. These denials were not based on the merits of the applications but the failure of the system to offer a reasonable opportunity to interview.

## BACKGROUND

### Supplemental Nutrition Assistance Program

In 1964 Congress established the federally funded, but state administered, food stamp program to raise levels of nutrition among low-income households. Effective October 1, 2008, the

federal food stamp program was renamed SNAP. The federal government provides complete funding to states for all SNAP benefits and pays at least 50% of the state's costs to administer the program. Under federal law, to be eligible for SNAP benefits, a household's net income must be below the federal poverty line.

Under SNAP, the administering agency is required to: provide benefits to eligible applicants within 30 days of the submission of the household's application; provide benefits to certain recipients with very low income within 7 days of the submission of an application; permit households to file an application on the first day they contact the local office during office hours; encourage households to file an application the same day the household or its representative contacts the administering agency in person or by telephone and expresses interest in obtaining benefits or expresses concerns indicating food insecurity; and make application forms readily accessible.

Paper applications must be made readily accessible and available even where the administering agency accepts applications through other means. The system must include a means for applicants to immediately file an application that includes only the name, address, and signature of the applicant. The administering agency is prohibited from denying or interfering with a household's right to apply for benefits in writing. Applications must be accessible to persons with disabilities in accordance with Section 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA"). Finally, the administering agency must mail an application form to a household on the same day a telephone request is received and inform households of their rights and responsibilities in the program.

Under USDA regulations, Defendant must either interview the applicant on the day of application, or, if this is not possible, schedule an interview promptly to ensure an opportunity to

participate within 30 days after the application is filed. If an applicant household misses a scheduled interview the administering agency must notify the household that the household is responsible for rescheduling the interview. If the household contacts the administering agency within the 30 day period following submission of the application the administering agency must reschedule the interview. To receive SNAP benefits, an individual must submit an initial application and complete an interview. To maintain SNAP benefits, individuals are required to recertify their SNAP eligibility on a regular basis which requires them to navigate the DSS's Call Center and be interviewed again.

### Department of Social Services

Missouri's Department of Social Services (DSS) is the single state agency responsible for administering SNAP in Missouri. Robert Knodell is the Department Director of DSS. The Family Support Division ("FSD") of DSS assesses the eligibility of SNAP applicants and disburses benefits to eligible households. Within FSD, there are three types of offices that assist with the administration of SNAP benefits: Processing Centers, Resource Centers, and Customer Service Centers. Employees in Processing Centers process SNAP applications to determine eligibility. Resource Center employees primarily assist individuals who visit the Center with verifications, answer questions, provide additional resources, and register applications. Employees in the Customer Service Centers answer the DSS Call Center phones, respond to questions, complete interviews, process cases, and inform callers of possible resources. All three offices are staffed with Benefit Program Technicians (BPTs) and Customer Information Specialists (CISs) who have the same training and are able to perform the same tasks.

4

## On-Demand Waiver

DSS obtained a waiver from the United States Department of Agriculture's Food and Nutrition Service ("FNS") which allows DSS to use an interview procedure which deviates from the process laid out in FNS regulations. Pursuant to the waiver, DSS is not required to schedule the SNAP interview at a specific date and time. Instead DSS must provide applicant households with a notice, known as an interview letter, instructing them to contact the Call Center within 5 days of submitting their application. Also pursuant to the waiver, applicants who do not complete their interview within 5 days are sent a notice of missed interview instructing applicants that they must complete their interview within 30 days of submitting their application or their application will be denied.

Pursuant to the waiver, eligibility interviews may be conducted in person or by telephone. Face-to-face interviews must be made available to any household that requests one. At the time of the application the administering agency must notify the household of the verification requirements they must meet and inform the household of the agency's duty to assist the household in obtaining required verification. The administering agency must provide a clear written statement of what a household must complete to obtain verification and complete an application.

Pursuant to Missouri's waiver, "[a]pplicants are able to have a face-to-face interview at the time of application or upon request for any reason." Applicants who request a face-to-face interview must have an appointment scheduled within five days. Also pursuant to Missouri's waiver, DSS has implemented predictive dialing for the Call Centers, which requires an attempted contact with applicants on the first day for all applications and continued attempts to call for four days if necessary.

5

DSS policy stipulates that applicants can access SNAP applications online, by mail, in person at a Resource Center, or at DSS community partner locations. Resource Centers are expected to make applications available in their lobby. FNS does not permit DSS to accept a SNAP application over the phone, but individuals can request that the Call Center mail them an application. However, there is no automated option in the Interactive Voice Response ("IVR") system to request that an application be sent.

Once an application is registered, DSS sends a notice to the applicant letting them know they have to complete an interview. DSS's eligibility system automatically denies applications if an interview has not been completed within 30 days, regardless of whether applicants attempted to secure an interview, or whether DSS meaningfully made an interview available. For example, in July 2023, over fifty percent of all denials were due to the failure to complete a timely interview and were not decided on the merits of the application.

## Call Centers

There are ten Customer Service Centers (CSCs). The Call Center hours are currently 6:00 a.m. to 6:00 p.m. Monday through Friday. CSC staff interact with applicants and recipients by phone, text, and internet chat. The number of staff at each CSC ranges from around twelve to forty-five. The phone system used in the Call Center is called Genesys. This system allows DSS to change something in the Genesys system very quickly as opposed to their old Cisco system. In Cisco, there were a limited number of lines available to callers and any new calls would be deflected if there were too many. Genesys, as a cloud-based system, has no limitations to the number of lines that can be used.

There are two Tiers within the Call Center: Tier 1 and Tier 3. Tier 1 calls are routed to staff regarding general DSS information. Tier 3 calls are routed to staff to complete a SNAP interview.

6

Tier 3 calls are further broken down into two components: "inbound" interview calls and "outbound" interview calls. When a caller dials the SNAP interview line, they are asked to enter their case number or SSN with their date of birth. The system will check whether an interview is needed on their case, and if so, the caller will be transferred to Tier 3. If the system does not report that an interview is needed, the caller will be transferred to Tier 1.

Shortly after the switch to Genesys, DSS limited the number of calls in each queue. To determine whether the queue is too full, Genesys performs a calculation each time a call comes in. Genesys first looks to see how many callers are in the queue. If there are fewer than the predetermined number of callers programmed in by DSS, the system moves the call into the requested queue. If there are more than the predetermined number of callers already in the queue, Genesys performs an additional calculation. Genesys evaluates the estimated wait time for a call and adds an additional "padding" to that wait time. If the wait time plus padded time is later than when the Call Center closes for the day, Genesys plays a recorded message and then terminates the call. As of May 10, 2023, the calculation for a call to the Tier 3 queue was the estimated wait time calculation plus two hours.

In early 2023, the Call Center changed the messaging a caller would hear when the queue was full. Before this change, the caller would be told that the Call Center was "unable to take your call, please try your call back again later." Now the message gives the caller a list of options. These options include live chat, visiting the website, going to the local Resource Center, or reporting changes and looking at benefits online. As a result of this change in messaging, the Call Center no longer labels calls that are turned away as "deflected," but rather as "redirected" calls. Like deflected calls, redirected calls are unable to reach a Call Center worker to complete an interview.

7

**Predictive Dialer**

Applications are registered in DSS's case management system, FAMIS. Applications that require an interview are flagged in FAMIS and then the application is added to the predictive dialer list. The following day, the predictive dialer makes a call out to the phone number associated with the application. Applications that are identified as eligible for expedited processing receive one call a day for two days (or until the interview is completed) from the predictive dialer. All other applications receive only one call. The number of calls the dialer makes at one time depends on the number of staff who are logged in to handle Tier 3 outbound calls.

When Genesys went live in June 2021, the predictive dialer was programmed to make five calls per staff member logged in to handle Tier 3 outbound calls. Because the Call Center was not able to handle this volume of calls, DSS changed this by programming the predictive dialer to make one call per staff member logged in to handle Tier 3 outbound calls. Staff who are logged in to the predictive dialer line are also logged in to the Tier 3 inbound line. The Tier 3 outbound line has priority over the Tier 3 inbound line and are prioritized over Tier 3 inbound calls. The daily load of predictive dialer calls generally ranges from 1,300 to 2,500. In late May and early June 2023, the predictive dialer load was consistently "well above 2,500," and reached 4,500 on June 14, 2023. If a caller picks up the predictive dialer call, the caller is placed in the predictive dialer IVR menu.

The IVR menu provides the option to: press 1 if the person who answered is the applicant and has twenty to thirty minutes to complete the call; press 2 if the person who answered does not have time to complete the call; press 3 if the applicant has already completed an interview; press 4 if the person who answered is not the person who applied and cannot get the applicant on the phone in the next three minutes; or, press 5 if the person who answered is not the person who

applied, but can get the applicant in the next three minutes. If the person who answers presses 5 but is unable to get the customer in the three minutes given, the call disconnects. If the person who answers presses 2, the application is never placed in the predictive dialer list again. If the person who answers presses 1, they are routed into the Tier 3 outbound queue. If all workers are on other calls when the caller enters the Tier 3 outbound queue, the caller is put on hold.

**Appointment Scheduler**

SNAP applicants have the option to schedule an appointment to be seen in person at a Resource Center or to receive a phone call from a DSS employee at a specific date and time. Applicants can schedule appointments by using DSS's appointment scheduler or by walking into a Resource Center and scheduling an appointment with a representative. However, same day appointments are not readily available for Resource Centers. DSS implemented a new appointment scheduler in March 2023. The appointment scheduler is available through the Call Center, but there is no menu option in the IVR for a caller to schedule an appointment. The option to schedule an appointment is only offered once the caller makes it into a queue. Because a caller is not offered the option to schedule an appointment until they are placed in the queue, the appointment scheduler is not offered to deflected callers.

Applicants can also access the automated appointment scheduler through DSSChat on DSS's website. It features a chatbot and when applicants begin a chat, they are offered the option to "make appointment" and can choose to schedule an in-person appointment or a phone appointment. Applicants can indicate to DSSChat when they want their appointment. If that time is not available, DSSChat returns the next three possible options for appointments. There are fifteen phone appointment slots available per hour for the entire state. The number of appointments at a Resource Center depends on the hours and staffing of each Resource Center.

9

Appointment slots are not exclusively reserved for SNAP interviews. For example, they are available for any conversation or meeting between a member of the public and a benefit program technician or a customer information specialist. Appointments are offered on a first-come, first-serve basis. The appointment scheduler does not account for any upcoming deadlines on the caller's case when assigning an appointment. There is no option for a caller to indicate any deadlines.

### Resource Centers

Resource Centers closed in March 2020 in response to COVID-19. Since February 2021, the Resource Centers have been in the process of reopening. The typical hours of operation for a Resource Center are 8 a.m. to 5 p.m. Monday, Tuesday, Thursday, and Friday, and 9 a.m. to 5 p.m. on Wednesdays. There were 123 Resource Centers across the state. Each county has at least one Resource Center. However, twenty-one of these Resource Centers are not fully reopened. Nineteen Resource Centers only have one staff member. Another sixty Resource Centers only have two staff members. Resource Centers with few or one staff may have to close when the staff member is sick or on vacation. The Resource Centers' locations and hours are listed on DSS's website. The website is the only place where customers can check the current Resource Center hours before going to a Resource Center. The website often contains inaccurate information regarding which locations are open or what the hours of operation are at each location. DSS admits it struggles to sufficiently staff some Resource Centers. For example, the record reflects one Resource Center that has a line out the door and over a two-hour wait because it does not have sufficient staffing and/or hours.

10

**Defendant's ADA Policies**

DSS qualifies as a public entity under the ADA. The Office for Civil Rights Director for the Department of Social Services serves as the designated ADA coordinator. Anna Wise is the Office for Civil Rights Director for DSS. Ms. Wise testified that she spends less than ten percent of her time on ADA-related matters for SNAP participants.

DSS's only policy regarding ADA accommodations for SNAP participants is contained in their Non-Discrimination Policy Statement. DSS does not mail or otherwise directly disseminate the Non-Discrimination Policy Statement to SNAP participants. The Department's Non-Discrimination Policy Statement is posted in Resource Centers and on DSS's website. The Non-Discrimination Policy Statement does not reference disability status and does not indicate that reasonable accommodations are required by federal law. The Non-Discrimination Policy Statement dictates that in order to receive an "auxiliary aid or service for effective communication, or a modification of policies or procedures to participate in a program, service, or activity of the Department of Social Services," an individual should notify the Department as soon as possible, and no later than forty-eight hours before a scheduled event by contacting either their DSS local office or the Office for Civil Rights Director for DSS.

However, Resource Centers do not have their own phone numbers and the Non-Discrimination Policy Statement does not provide instruction as to how an individual who requires a reasonable accommodation should request one. Further, a SNAP interview is not treated as a "scheduled event."

The Office for Civil Rights is the sole decider on outcomes of complaints submitted by SNAP applicants or recipients related to disability-based discrimination or refusal to grant reasonable accommodations. DSS has no written standards or criteria for granting, denying, or

11

otherwise resolving requests for reasonable accommodation made by SNAP applicants or participants. The Office for Civil Rights does not follow up to monitor how the reasonable accommodation request was handled, or whether it was implemented in any way. If DSS denies the request for a reasonable accommodation, there is no written policy, standard, or mechanism for the individual to appeal that denial within DSS. The Department does not stay or toll SNAP deadlines regarding compliance with eligibility requirements while a reasonable accommodation request is being processed. There is no policy allowing a granted reasonable accommodation to continue the next time the SNAP applicant or recipient interacts with the agency. There is no policy for the timeline to make a decision on a reasonable accommodation request. There is no written policy on who has the authority to grant or deny reasonable accommodation requests.

All DSS employees receive an internal civil rights and diversity training upon hire, and frontline staff receive subsequent internal civil rights and diversity training every three years. The DSS training includes only three slides, out of 129 total, that discuss participant ADA accommodations. The DSS training states that if staff receive an accommodation request, they should: document the request in the case file; notify their chain of command; and approve the request if they are able to meet the needs of the client at the local office and the request does not create an undue hardship. The training does not discuss how to respond to a request for accommodation where a client's needs must be met over the phone. The training does not inform staff how to recognize or acknowledge an accommodation request. The training instructs DSS staff to work through their chain of command and contact the ADA coordinator before they deny any requests. DSS does not evaluate or test staff knowledge retained from attending the agency's civil rights and diversity training.

In addition to the DSS training, staff and supervisors also attend a yearly online SNAP training related to civil rights, created by USDA. The USDA training has one slide out of twenty three that discusses the ADA. BPTs and CISs receive no other training regarding the ADA or reasonable accommodations. The USDA SNAP civil rights training states that upon request for an accommodation, staff should: document the request in FAMIS, notify their chain of command, approve the request if they are able to meet the needs of the client at the local office and the request does not create undue hardship on the operation of the agency, and, before staff deny a request or if staff are unsure about a denial, they should work through their chain of command and contact the ADA Coordinator/Office of Civil Rights Manager. During twelve weeks of additional program training, Call Center staff receive no specific training on procedures for processing or resolving reasonable accommodation requests from SNAP applicants or participants.

BPTs and CISs receive no training on how to identify when a SNAP participant or applicant with a disability might need a reasonable accommodation, or whether to affirmatively offer assistance. If staff encounter a person with a disability who requires additional explanation for SNAP interview questions, they are expected to handle it the best they can. The Department does not keep a log of, or otherwise track or monitor, reasonable accommodation requests made by participants. The DSS Office for Civil Rights Director also does not keep a log of reasonable accommodation requests that are sent to her for review.

In its SNAP notices sent to households, DSS does not include information on how to request a reasonable accommodation authorized by the ADA or file an ADA-related complaint with DSS's Office of Civil Rights.

The USDA's language states that: "In accordance with Federal civil rights laws and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies,

offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, religious creed, disability, age, political beliefs, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by the USA."

SNAP notices contain nothing to inform an applicant or participant on how to file a complaint concerning disability-based discrimination with DSS. The only instruction directs an applicant or participant to complete the USDA program complaint form. At no point in the Call Center's IVR system, on either Tier 1 or Tier 3, can SNAP applicants or other callers with disabilities request an accommodation. SNAP applicants and participants must either wait on hold in one of the Call Center queues or call the Office of Civil Rights directly.

### Plaintiff Mary Holmes

Ms. Holmes suffers from throat cancer and chronic obstructive pulmonary disease. She does not have internet access nor does she have any reliable means of transportation. In January 2022, Holmes attempted to call DSS's Call Center to request an application to recertify her SNAP benefits. She called three times during the first week of January but was unable to complete any of the calls.

On January 10, 2022, Ms. Holmes paid a family member to take her to a Resource Center. After a 20-minute wait she spoke to an employee and submitted her application. She asked to be interviewed in person and was told the resource staff was not doing interviews and that she would receive a call from DSS within the next few days. DSS registered Ms. Holmes' application on January 11, 2022. On January 12, 2022, Ms. Holmes answered a call from DSS but was never connected to a representative. On January 13, 2022, Ms. Holmes contacted the Call Center and was asked a series of automated questions. After answering the questions, she entered the queue

14

and was told there were 472 people in front of her. She waited for 2 hours but was never connected to a representative. Ms. Holmes called again and stayed in the queue for 6 minutes and 12 seconds before disconnecting. She tried to call again several more times and each time she was unable to enter the queue because her call was deflected due to the volume of calls exceeding capacity.

On January 14, 2022, Ms. Holmes called again and answered the automated questions. She was told there were 692 people in front of her in the queue. She waited for an hour and thirty seven minutes but was never connected to a representative. Ms. Holmes called again on January 27, 2022, and was deflected. She called again on January 28, 2022, and stayed in the queue for fourteen minutes and twelve seconds before disconnecting.

During the first week of February 2022, Ms. Holmes received a notice from DSS indicating she needed to complete her interview and that DSS would attempt to reach her. She was informed that she should call DSS if she missed the call. Ms. Holmes was further advised her application would be denied if she did not complete the interview. Ms. Holmes did not receive any calls from DSS after receiving the notice.

Ms. Holmes tried to call multiple times in February 2022 to complete her interview. During her two attempts on February 4th the calls were deflected. During the week of February 7, 2022, Ms. Holmes received notice that her SNAP application was denied for failure to complete the interview. Prior to filing her lawsuit Ms. Holmes had not been approved for benefits from the date of her application on January 10, 2022 through March 20, 2023. Ms. Holmes will have to reapply for benefits and complete an interview to maintain her benefits.

### Plaintiff Andrew Dallas

Mr. Dallas has epilepsy which causes him to suffer frequent seizures. Mr. Dallas's seizures can result from stress, a poor diet, skipping meals, and not getting enough sleep. He averages one

seizure per week but suffers them more frequently when stressed. As a result of his seizures Mr. Dallas often feels confused suffering a "brain fog" which has worsened over time. His only income is supplemental security income, and he has been approved by Medicaid for home health services. Mr. Dallas is not able to drive due to his epilepsy. Mr. Dallas finds SNAP recertification paperwork complicated and confusing.

On December 23, 2021, DSS received a document from Mr. Dallas entitled "Food Stamp Change Report." In the report Mr. Dallas wrote: "I have epilepsy + cannot understand like normal people do. Please help! I am not sure I understand all of the letter. I am disabled." On the report Mr. Dallas also wrote: " I am an Epileptic. I hope I got everything right".

In January 2023, DSS mailed Mr. Dallas recertification paperwork. The notice stated that if he did not complete the paperwork by February 28, 2023 his benefits would end. Mr. Dallas was not offered any assistance with his recertification application despite his request for an accommodation. Between February 8-10, 2023, Mr. Dallas called DSS's information line approximately ten times. At least three times he was not able to make it past the main menu's language prompts. On occasion Mr. Dallas made it past the main menu but was put on hold and told there were 234 callers ahead of him. He discontinued the calls. Mr. Dallas was not able to complete his recertification until after he joined this lawsuit. After joining the lawsuit, he was approved for SNAP benefits. Under the current DSS policies Mr. Dallas will be required to make another reasonable accommodation request every time he needs assistance with paperwork and every time his recertification becomes due.

**Plaintiff Denise Davis**

Denise Davis first applied for benefits on November 12, 2022 when she submitted her application online. She never received any follow-up communication from DSS about her

16

application. When Ms. Davis contacted the Call Center she was informed there was no application registered under her Social Security number and that she should reapply. On December 29, 2022, Ms. Davis submitted a second online application. She was subsequently hospitalized with acute kidney failure for two weeks and did not have access to her phone. After being released from the hospital she contacted the Call Center multiple times each week to complete her interview.

On January 4, 2023, Ms. Davis called the Call Center twice and both times her calls were deflected. On January 10, 2023, Ms. Davis again called the interview line and was deflected. She later called and made it into the queue but then the call was disconnected. On January 12, 2023, Ms. Davis called the SNAP interview line and waited in the queue for 1 hour and 52 minutes before disconnecting. She called back again multiple times that day and was deflected each time. Ms. Davis also attempted to call the general information line and was deflected. At one point, she called the interview line and was able to connect but was unable to speak directly to anyone.

On January 13, 2023, Ms. Davis called the general information line and the interview line and was deflected both times. Each time Ms. Davis called and was able to enter the queue there were hundreds of people ahead of her. On more than one occasion there were more than 700 people in the queue and Ms. Davis often waited between 2 and 3 hours. After waiting 2 or 3 hours, and until fewer than 100 people were ahead of her in the queue, she heard a recording that DSS was receiving too many calls and that she should call back later. At that point, her call was terminated by the Call Center system.

In early January 2023, Ms. Davis received a DSS letter stating she needed to complete an interview to process her application. Shortly afterwards she received another notice stating that if she did not complete an interview by January 30, 2023 her application would be denied. Despite

17

multiple attempts to the Call Center Ms. Davis was not able to complete her interview and her application was denied.

Ms. Davis submitted a third application on January 30, 2023. On February 1, 2023 she received a call from DSS and was informed that she was in a queue behind seventeen other people. When Ms. Davis was finally connected to a DSS worker they requested her case number. Ms. Davis did not know her case number but did provide her Social Security number. The DSS worker accepted the information but then hung up on her. The call records for this interaction show that Ms. Davis did connect to a worker and that the total interaction time was five minutes and fifty two seconds. Ms. Davis immediately called back but heard a recording that 300 people were waiting ahead of her in the queue. She called again and waited for an hour and fifty eight minutes before disconnecting. She then called again and waited for six minutes and thirty seconds before disconnecting. Ms. Davis received another call from DSS on February 2, 2023, but it went to her voicemail. She called back and waited in the queue for almost two hours before disconnecting.

On February 3, 2023, Ms. Davis received a call but it went to voicemail. She called back twice but disconnected shortly after getting into the queue. Ms. Davis called her local DSS office to set up an appointment for an in-person interview. She was automatically transferred to the Call Center and was put on hold again. Ms. Davis also attempted to use the DSS chat feature twice to complete her interview. Each time the chat directed her to the Call Center.

Despite multiple attempts to the Call Center and a visit to the Resource Center, Ms. Davis had not been able to complete her interview. Ms. Davis attempted to be interviewed by the Call Center approximately fifteen times after submitting her third application. She was never able to connect to a DSS worker to complete the interview. Ms. Davis received a letter from DSS dated February 1, 2023, stating that she needed to complete an interview for her application to be

processed. A few days later, she received a notice dated February 7, 2023, stating that if she did not complete an interview by March 1, 2023, her application would be denied. Only after joining this lawsuit did Ms. Davis receive an interview and then was approved for benefits.

**Plaintiff Empower Missouri**

Empower Missouri is a not for profit organization organized under Missouri law that works to ensure that all people of Missouri have access to adequate nutrition, quality health care, decent housing, and an appropriate education. Empower Missouri devotes significant time, energy, and resources to issues arising from DSS's administration of SNAP. Empower Missouri is a founding member of the SNAP Advisory Group. Starting in January 2022, the Advisory Group held monthly calls with the Family Support Division of DSS regarding SNAP-specific issues. The SNAP Advisory Group dedicates a portion of its meetings to reviewing DSS Call Center data regarding the extensive wait time and deflection issues.

Empower Missouri also convenes the Food Security Coalition (FSC), a group of anti-hunger advocates and providers in Missouri. Empower Missouri provides resources and information to anti-hunger advocates and communicates with DSS regarding agency failures in Missouri's administration of SNAP. Because of the numerous issues with DSS's administration of SNAP, Empower Missouri staff divert considerable time and effort organizing and managing the FSC which is comprised primarily of direct service providers including food banks and anti-homeless organizations.

Empower Missouri's Food Security Coalition budget for fiscal year 2023 was $161,020.64. Empower Missouri has spent $96,000 for fiscal years 2021, 2022, and 2023 relating to issues arising from DSS's administration of SNAP. Empower Missouri's Food Security Policy Manager has diverted roughly twenty percent of her time because of issues arising from DSS's

19

administration of SNAP. Both Empower Missouri's Executive Director and Policy Director have diverted roughly ten percent of their time because of issues arising from DSS's administration of SNAP. Empower Missouri has diverted staff time from proactive policy reform efforts regarding school meals, WIC, and seniors' access to SNAP to respond to issues created by DSS's administration of SNAP.

**Additional Evidence**

Missouri citizens who were not named plaintiffs have also encountered problems with the DSS system and the failed Call Centers have prevented other SNAP applicants from completing their interviews. Patricia Matousek attempted to complete her interview in the beginning of 2022. Between the end of December 2021 and May 2022, Ms. Matousek called DSS at least once a week, in total between ten and twenty times. Most of her calls were deflected. Every time she made it past the IVR prompts and into the interview queue, there were hundreds of people ahead of her in the queue. Ms. Matousek submitted three applications for SNAP and was denied each time for failure to interview.

Elizabeth Dodd attempted to complete her interview in November and December 2021. She called numerous times and routinely was on hold for hours and multiple times after waiting on hold for hours her call was disconnected. In January 2022, Shelby Wall tried to call the Call Center over ten times and was never able to connect to someone for an interview. Victoria Dempsey, the Program Director of the Youth and Family Advocacy Program at Legal Services of Eastern Missouri, called the interview line on behalf of her client at various times of day over the course of multiple days in April 2023. When she was able to get into the queue, there were always at least fifty callers ahead of her. Otherwise, she was directed to go to a Resource Center and the call was disconnected.

20

Daniel Underwood, the Managing Attorney of the Youth and Family Advocacy Program at Legal Services of Eastern Missouri, called the interview line on behalf of his clients on August 17, 2023. He was told he was 150th in the queue and waited for ninety minutes before the Call Center disconnected him. He called again that afternoon but was deflected. On August 18, 2023, he called again and was told he was 225th in the queue. He waited for about thirty to forty minutes before he disconnected.

Patriona Spates, the Intrada Coordinator at Epworth Children & Family Services, accompanied a client to the Resource Center to assist them in completing an interview. The staff at the Resource Center told Ms. Spates and her client that they were unable to do an interview because of staffing problems.

James Shelton was diagnosed with Type I diabetes in 1994. In 2011, he was diagnosed with diabetic retinopathy, and as a result, his vision is very limited. In the past, Mr. Shelton has had trouble with SNAP paperwork due to his visual impairment. He has taken documents to the Kirksville Family Support Division Resource Center to have staff read the documents to him. Mr. Shelton uses a screen reader on his phone and has asked the Family Support Division many times to send notices to him electronically. He has visited his local Resource Center many times over the past four years. Every time, he has asked them to send SNAP notices in a digital format to accommodate his vision disability. On June 20, 2023, Mr. Shelton went to the Kirksville Resource Center because his SNAP benefits had been terminated. He was told that he had not returned his SNAP mid-certification review form. Mr. Shelton told a Resource Center supervisor that DSS is required to send him SNAP notices in a format he can read. The supervisor responded that FSD does not have to do this.

21

L.V. had to submit a recertification for SNAP in January 2022. L.V. could not go to a Resource Center to complete her interview because her diabetes, trouble breathing, COVID-19 related heart trouble, extreme fatigue, and migraines, made it too difficult to leave her home. L.V. had no choice but to rely on DSS's Call Center. Despite multiple attempts to complete her interview through the Call Center in early 2022, L.V. was not able to speak to an individual to complete her interview. Her application was denied for failure to complete the interview.

## PROCEDURAL BACKGROUND

In February 2022, Plaintiffs filed this action asserting Defendant violated rights protected by the SNAP Act, the Due Process Clause, and the ADA. Simultaneously, Plaintiffs filed a motion seeking a TRO barring Defendant from depriving them of the SNAP benefits to which they were entitled. At the TRO motion hearing, the Court suggested the parties create a process through which Plaintiffs' counsel could alert Defendant's counsel about a SNAP applicant who had difficulty in scheduling an interview and find a resolution together, without having to seek emergency relief from the court.[1]

## LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The plain language" of the Rule "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged

---

[1] Plaintiffs' counsel has notified Defendant of just over three dozen individuals who had difficulty in scheduling an interview and Defendant promptly scheduled interviews for these applicants.

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A genuine issue of material fact only exists if a reasonable factfinder could return a verdict for the non-moving party. *Id.* at 248. "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

## DISCUSSION

Plaintiffs claim that Defendant, in his official capacity, has violated, and continues to violate, their rights under the Due Process Clause of the Constitution and the federal SNAP laws.[2] Plaintiffs also claim that Defendant has failed to meet clear obligations under the ADA.[3]

To begin, and as stated by the Plaintiffs, "the importance of food cannot be overstated. Neither can the consequences of hunger. Courts have long recognized that food deprivation creates a 'brutal need' with significant, lasting physical and emotional effects." Citing, *Goldberg v. Kelly*, 397 U.S. 254, 260–65 (1970). With this in mind, the federally funded, state administered SNAP program provides food assistance benefits to low-income individuals, allowing them to obtain food while using their resources for other needs.

DSS is required by federal law to provide SNAP benefits to all eligible Missourians who depend on DSS to assist them. Federal law requires Defendant to provide timely, accurate, and fair service to applicants for, and participants in, the SNAP program. However, as reflected in the facts presented in this case the Missouri system is broken and inaccessible. The changes, modifications,

---

[2] "Section 1983 provides a civil action against persons who, under color of law, cause a 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Hannon v. Sanner,* 441 F.3d 635, 636–37 (8th Cir.2006) (quoting 42 U.S.C. § 1983).
[3] The ADA provides its own cause of action. 42 U.S.C. §§ 12131–12134.

and adjustments made by DSS after increasing its reliance on its telephone system to process SNAP applications have proven unsuccessful in fulfilling Defendant's responsibility to provide timely, accurate, and fair service for applicants and participants in the program. While call wait times fluctuate and have shown some improvement, the record demonstrates too little progress. Consequently, Missourians who suffer food insecurity have been forced to either go hungry or seek alternative sources of food when their applications are denied.

Further, efforts by DSS have not made sufficient progress in adding needed manpower. The hours of operation and staffing of offices have not been expanded to accommodate the needs of eligible applicants. The denial of benefits to eligible households based on the inability to complete timely interviews remains unacceptably high. Too many applicants are rejected based on the failure of the system, rather than substantive evaluation of the applications. The Court is aware that the State of Missouri must operate under a balanced budget and that there are multiple demands for the State's resources. Here, however, since the federal government pays 100% of benefits and at least 50% of administrative cost for the program it is a challenge to believe that State resources are inadequate to address the problems with the Defendant's administration of the program. This is especially so since the Court is mindful that the State has received financial assistance from the federal government attributable to the COVID-19 pandemic. More importantly, state officials have found it appropriate to enact tax cuts reducing available state revenues during the period the SNAP program has been inadequately administered.

**SNAP Requires Defendant to Provide Benefits to All Eligible Applicants**

Courts commonly order heads of SNAP administering agencies to comply with the requirements of SNAP. *See, e.g.*, *Robertson v. Jackson*, 972 F.2d 529, 533 (4th Cir. 1992) (commissioner of agency administering Food Stamps was "fully responsible" for ensuring

24

compliance with federal requirements); and *Southside Welfare Rights Org. v. Stangler*, 156 F.R.D. 187 (W.D. Mo. 1993) (enjoining head of Missouri DSS to comply with "program access" requirements). Wrongful denials of SNAP benefits are one such violation.

In *Barry v. Lyon* the Sixth Circuit upheld a district court ruling that Michigan violated the SNAP Act by imposing an additional eligibility requirement beyond what the legislation required. 834 F.3d 706 (6th Cir. 2016). Michigan used an automated system to determine whether applicants appeared on a list of people with warrants for felony charges, with no further checks. Denials were automatic, and otherwise-eligible people were wrongfully denied.

Similarly, here, Defendant's reliance on an inadequate automated system and understaffed offices to provide interviews also violates Defendant's obligation under SNAP and Defendant's on-demand waiver. Defendant's automatic denials of eligible applicants based on an automated system constitutes a wrongful denial of benefits. Defendant is required to provide benefits to all eligible applicants and must ensure that it has a system that allows for this to happen. Here, an alarming number of eligible applicants are denied based on Defendant's failure to make timely interviews available. When applicants who are otherwise eligible for benefits are denied those benefits for failure to interview, due to no fault of their own, Defendant has violated its obligations under the law.

For example, Defendant does not dispute that Holmes was eligible for SNAP when she applied in January 2022. The records establishes that she made diligent efforts to be interviewed, including requesting an in-person interview and making numerous calls. However, her application was denied because she was unable to complete the interview. Davis also applied for SNAP multiple times and Defendant does not dispute that Davis was eligible. She made numerous efforts

25

to be interviewed, but despite all those efforts (as fully described herein) her applications were denied because she was unable to complete the interview.

These Plaintiffs met, and continue to meet, the eligibility criteria for SNAP but Defendant rejected their applications because DSS made it impossible for them to be interviewed through the Call Center and offered them no alternative means to have the interview in a timely manner. The Court finds Defendant was required to provide Plaintiffs, who were eligible under SNAP, with SNAP benefits but failed to do so. As clearly set forth herein, there are systemic, ongoing problems with the application, interview, and approval process. As a result, Plaintiffs, and other citizens, are further at risk of losing SNAP benefits each and every time they have to use Defendant's system to recertify their benefits.

In addition to the interview, Defendant also has an obligation to ensure that all applicants are able to file applications. Plaintiff Holmes was unable to file a SNAP application on the first day she contacted the agency due to limited IVR prompts and Call Center issues. In fact, it was after multiple days of contacting DSS that Holmes ultimately had to visit a Resource Center to obtain an application for submission. The inability to access the Call Center operations delayed Holmes' application for SNAP. Further, and even more importantly, it required her to find a means of transportation that she did not have and that was costly to her on a low income. Plaintiffs' experiences, and those of others, who confronted the problems with the telephone system is not surprising given the lengthy wait times and number of calls which were deflected or redirected by the system previously described in this Order.

## Standing

First, to establish standing, Plaintiffs must establish that they have suffered an injury in fact, that the injury is fairly traceable to Defendant's actions, and that it is likely to be redressed

by a favorable court decision. See *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted); and *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendant argues Empower Missouri cannot establish an injury in fact. An injury in fact is an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs*, 528 U.S. 167, 180 (2000).

An organization may establish organizational standing on its own behalf when there is a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources..." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). To establish organizational standing, Empower Missouri can show direct injury by a diversion of organizational resources to identify or counteract the allegedly unlawful action. *Id.* Diversion of resources can occur when an organization has to use resources that could have been spent on other activities, but instead must divert those resources to address a violation. *Id.*; see also *Nat'l Fed. Of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999).

The record establishes that Defendant's failure to provide timely, accurate, and fair service to SNAP applicants has caused Empower Missouri to divert significant financial and staffing resources to work that is directly related to Defendant's failed implementation of SNAP. For example, Empower Missouri must continually divert resources from their organizational mission in response to Defendant's wrongful denials of SNAP applications, including spending $96,000 over three years responding to Defendant's administration of SNAP. Defendant's failure to allow all applicants to submit an application on the first day they contact the agency also impacts Empower Missouri, which must continually divert resources from its organizational mission to

27

address Defendant's failures and assist in these applications. As a result, the Court finds Empower has organizational standing.

In addition, the Court finds Article III standing because all Plaintiffs have established an injury "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 at 338. In suits against the government where "the plaintiff is himself an object of the action (or forgone action) at issue. . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). A threat of continuing legal violations may be redressed by injunctive relief. *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006).

Here, the individual Plaintiffs are at substantial risk of losing SNAP benefits, and as stated Empower Missouri has been forced to divert resources, because of Defendant's specific unlawful policies and practices. Defendant continues to engage in these policies and practices, causing ongoing or recurring harm to Plaintiffs, including their requirement to apply for recertification and re-interview to continue to receive benefits that they are eligible for. Therefore, a court order declaring these practices unlawful and requiring Defendant to change them would redress Plaintiffs' injury. The Court finds Plaintiffs have Article III Standing.

Defendant also argues Plaintiffs' claims are moot to the extent they received benefits and were granted interviews. However, a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." See *Mo. Prot. & Advoc. Servs. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007) (internal citations omitted) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the

28

allegedly wrongful behavior could not reasonably be expected to recur."). The Defendant "'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."' *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) ("a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.") (internal citation omitted).

Here, Defendant granted Plaintiffs their interviews after the lawsuit was filed and in turn, the individual Plaintiffs received their benefits. However, this one-time interview does not address the continued problems with Defendant's system, nor the challenges Plaintiffs will face when they must recertify their benefits. Defendant's system continues to automatically deny all applications when an interview has not been completed within 30 days and the record reflects the number of denials due to a missing an interview is around 50%. For all these reasons, and the reasons set forth throughout this Order, the Court finds Plaintiffs' claims are not moot simply because they were granted an interview after this litigation was filed.

## Due Process Rights

The Court agrees with Plaintiffs that Defendant's wrongful denials of SNAP applications also violate the Due Process Clause. Plaintiffs have a protected property interest in the SNAP benefits to which they are entitled. Defendant's policy and practice of wrongfully denying SNAP applications for failure to interview deprives them of access to a critical benefit to which they are otherwise eligible. This is even more true when the denial for failure to interview is caused by Defendant's failed system.

The Supreme Court has long held that public benefits recipients, including SNAP recipients, have a property interest in their benefits. See *Goldberg v. Kelly*, 397 U.S. at 261-63 (public benefits recipients have a property interest in benefits to which they are entitled under statute); and *Atkins v. Parker*, 472 U.S. 115, 128 (1985) (food stamp benefits are a matter of statutory entitlement for persons qualified to receive them and are appropriately treated as a form of property protected by Due Process). Every circuit court to consider the question, including the Eighth, has found applicants for public benefits hold this property interest. See *Daniels v. Woodbury Cnty., Iowa*, 742 F.2d 1128 (8th Cir. 1984); *Kapps v. Wing*, 404 F.3d 105, 115 (2d Cir. 2005); *Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004); *Mallette v. Arlington Cnty. Emps.' Supp. Ret. Sys. II*, 91 F.3d 630, 535 (4th Cir. 1996); *Griffeth v. Detrich*, 603 F.2d 118, 121–22 (9th Cir. 1979).

Once the court determines that due process applies, the next question is what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). The court in considering what procedures due process may require in a given set of circumstances must begin with a determination of the precise nature of the government function involved and also the private interest that has been affected by governmental action. *See Id.* ("it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure"); *see also Goldberg*, 397 U.S. 254; and *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961).

Courts have applied one of two tests in analyzing this question. In *Mathews v. Eldridge* the Court applied a balancing test, which considers: (1) the private interest affected; (2) the risk of erroneous deprivation and the value of additional or changed procedures; and (3) the government's interest. 424 U.S. 319, 335 (1976). In addition, "due process requires that [benefits] be administered to ensure fairness and freedom from arbitrary decision-making as to eligibility," and

30

that benefit programs be administered in a manner that "ensure[s] the fair and consistent application of eligibility requirements." See *White v. Roughton*, 530 F.2d 750, 753–54 (7th Cir. 1976) (federally subsidized public assistance is governed by statute and extensive regulations); see also *Carey v. Quern*, 588 F.2d 230, 232 (7th Cir. 1978) (program must "ensure fairness and avoid the risk of arbitrary decision making"); *K.W. ex rel. D.W. v. Armstrong*, 1:12-cv-00022-BLW-CWD, 2023 WL 5431801 (D. Idaho Aug. 23, 2023) ("absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause") (citing *Smith v. Goguen*, 415 U.S. 566, 578 (1974)); *M.A. v. Norwood*, 133 F. Supp. 3d 1093, 1098 (N.D. Ill. 2015); *Strouchler v. Shah*, 891 F.Supp. 2d 504, 515–516 (S.D.N.Y. 2012); *Baker-Chaput v. Cammett*, 406 F. Supp. 1134, 1130–40 (D. N.H. 1976); *Torres v. Butz*, 397 F. Supp. 1015 (N.D. Ill. 1975).

Here, Plaintiffs have a property interest in SNAP benefits and the Court finds under either test, Defendant's wrongful denial of SNAP applications deprives Plaintiffs of procedural due process. First, Defendant's denial of Plaintiffs' SNAP applications violates procedural due process under the *Mathews* test. Plaintiffs' private interest is high as Defendant has deprived them of subsistence benefits. To be deprived of SNAP is to be deprived of food, and courts have recognized a high interest in SNAP and similar benefits. *See, e.g., Daniels*, 742 F.2d at 1133.

Further, the Eighth Circuit has held that arbitrary decision-making in a subsistence benefits program constitutes a due process violation because of the high risk of erroneous deprivation. *Daniels*, 742 F.2d at 1133; see also *Bliek v. Palmer*, 102 F.3d 1472,1476 (8th Cir. 1997). Plaintiffs are indisputably eligible for SNAP benefits but their applications were denied without a meaningful, realistic opportunity to interview, and without having systems capable of keeping their applications alive to accommodate delays in obtaining an interview. Here, applicants are being denied benefits not based on the merits of their application but on the failure to obtain an interview.

Further, the failure to interview is a direct result of Defendant's inability to provide an efficient and successful system that allows applicants to schedule and complete an interview within the required time frame.

Further, these unacceptable statistics regarding wait times, failures to interview, and obstacles in the process to obtaining SNAP benefits are not merely inconveniences to the Plaintiffs but constitute actual barriers to Plaintiffs receiving benefits they are entitled to under SNAP. There has been no dispute that Plaintiffs were entitled to SNAP benefits, and after filing this lawsuit, actually received their benefits. When Plaintiffs are required to recertify their SNAP eligibility they will again face these obstacles, as will other Missourians in similar situations.

Here, the federal government has issued standards for uniformly and objectively determining SNAP eligibility. Defendant rejected Plaintiffs' applications for failure to complete an interview within 30 days. When the Defendant denies all SNAP applications for which an interview has not been completed on the 30th day, regardless of attempts by the applicant to be interviewed, this amounts to arbitrary agency action.

### Americans With Disabilities Act

Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and to provide "clear, strong, consistent, enforceable standards addressing discrimination" against those individuals. 42 U.S.C.A. § 12101. The ADA specifically protects against discrimination against individuals with disabilities that persists in such critical areas as access to public services. *Id.* Title II of the ADA provides an essential anti-discrimination mandate: "no qualified individual with a disability[4] shall,

---

[4] A "qualified individual with a disability" is a person with a disability who "with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104. "The

by reason of such disability[5], be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In implementing Title II, the U.S. Department of Justice emphasized that the failure to provide reasonable accommodations constitutes discrimination on the basis of disability:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7)(i).[6] "In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter,* 354 F.3d 761, 767 (8th Cir. 2004).

To establish a violation of Title II of the ADA Plaintiffs must demonstrate: 1) they are qualified individuals with disabilities; 2) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities; and 3) that this exclusion or denial was by reason of their disabilities. *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).

As the Eighth Circuit has established:

> We have long held the ADA requires meaningful access to the public entity's services and that mere limited participation does not satisfy this requirement. To meet the meaningful access standard, public entities . . . "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to . . . gain the same benefit."

<hr>

statute's use of the term 'qualified' suggests that we must look not to the administration of the program for which the plaintiff is qualified, but rather its formal legal eligibility requirements." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003).
[5] The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).
[6] Reasonable "modifications" and "accommodations" are treated interchangeably by the courts. *McElwee v. County of Orange*, 700 F.3d 635, 640 n.2 (2d Cir. 2012).

*Segal v. Metro. Council*, 29 F.4th 399, 404 (8th Cir. 2022) (quoting *Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010).

The ADA further requires public entities to "take affirmative actions to provide qualified disabled individuals with access to public services." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004). Defendant must provide necessary reasonable accommodations to qualified individuals with disabilities and when an individual submits a request for a reasonable accommodation, Defendant must be able to provide "a prompt and equitable resolution." See 28 C.F.R. § 35.130(b)(7)(i).

The ADA also requires Defendant to notify applicants and participants about their rights, and to create an effective grievance system by which qualified individuals with disabilities can submit complaints regarding ADA-prohibited discrimination. 28 C.F.R. § 35.106 and § 35.107.

Plaintiffs Dallas and Holmes are qualified individuals with disabilities and their disabilities were known to Defendant. DSS denied Plaintiff Dallas meaningful access to SNAP by failing to accommodate his disability. Plaintiff Dallas submitted a written request for accommodation on his SNAP Change Report requesting assistance with his SNAP paperwork. However, Dallas was not provided an accommodation. Defendant does not track accommodation requests in its system. Defendant does not have a policy that offers Plaintiff assistance with future SNAP documents, including recertification. Defendant's failure to accommodate Plaintiff resulted in denial of meaningful access to SNAP recertification and violates the ADA. Further, because Plaintiff will continue to rely on SNAP, he will suffer harm every time he must interact with DSS to recertify and maintain his benefits.

DSS also deprived Plaintiff Holmes of meaningful access to SNAP because of her disabling condition. In January 2022, Plaintiff Holmes was forced to visit a local Resource Center to submit

a SNAP application, after the Call Center made it impossible to request an application form over the phone. While at the Resource Center Plaintiff requested a same-day interview but was denied. Plaintiff Holmes was unable to visit the Resource Center a second time and unable to reach DSS via their phone system. As a result, Defendant denied her SNAP application. Because Defendant made no accommodation for Plaintiff Holmes, she was unable to obtain SNAP benefits for which she was eligible, until after she filed this lawsuit.

Defendant's failure to inform Plaintiffs of their rights and to provide a system by which Plaintiffs could seek an accommodation results in denial of meaningful access to SNAP. This in turn led to the denial of benefits. Again, Plaintiffs will face these same obstacles each time they must recertify their SNAP eligibility. The record also reflects that Defendant does not provide workers with appropriate training on an accommodation process. For all these reasons, Defendant's policies and practices, or lack thereof under the ADA, are unlawful and fail to meet its responsibilities under the ADA.

## INJUNCTIVE RELIEF

In considering whether to issue injunctive relief, the Court weighs: (1) Plaintiffs' likelihood of irreparable harm; (2) the balance between harm to the Plaintiffs and the injury that the injunction's issuance would inflict upon Defendants; and (3) the public interest. *See Oglala Sioux Tribe v. C&W Enterprises, Inc.*, 542 F.3d 224, 229 (8th Cir. 2008) (factors considered for permanent injunction are the same as preliminary injunction, except that a permanent injunction requires actual success on the merits, not likely success). No single factor is dispositive of the request for an injunction, as the Court considers all of the factors and decides whether, on balance, they weigh towards granting the injunction. *Dataphase Sys. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

35

Plaintiffs ask the Court to enjoin Defendant from denying SNAP applications for eligible individuals who have not been given a meaningful opportunity to complete their interviews; ensure that all SNAP applicants have a meaningful opportunity to complete an interview; and ensure that all Missouri residents are provided with an opportunity to apply for SNAP on the first day that they contact DSS.

Plaintiffs also ask the Court to enjoin Defendant to provide reasonable accommodations to Plaintiffs to enable them to access and maintain their eligibility for SNAP; notify SNAP applicants and recipients about the nondiscrimination requirements of Title II of the ADA, including the process by which they can seek a reasonable accommodation; and ensure the process for applicants and recipients to request an accommodation of their disabilities permits meaningful access to SNAP.

Here, the Court has found that Plaintiffs are eligible, low-income individuals who rely on SNAP for food. Further, they have disabilities or health conditions that make it difficult for them to work. Every day Plaintiffs go without SNAP there is a deprivation of nutrition, and along with that comes psychological and physical distress. In addition, Plaintiffs will be required to recertify their SNAP eligibility and complete other required paperwork. Plaintiff Empower Missouri also is irreparably harmed by Defendant's continuing violations for the reasons discussed herein.

The Court finds for the reasons set out in this Order that the balance of harms weighs in favor of granting the relief requested by Plaintiffs. Plaintiffs seek an injunction ordering Defendant to enact policies and procedures in compliance with the SNAP Act, the Due Process Clause, and the ADA. Further, granting injunctive relief to Plaintiffs is in the public interest. An injunction that requires Defendant to operate SNAP in compliance with the SNAP Act, the Due Process Clause, and the ADA certainly promotes the public interest.

**DECISION**

The evidence is overwhelming that the current administrative process utilized by Defendant fails to meet its obligations imposed by the SNAP program. The system does not timely, accurately, and fairly service applicant households. The high percentage of denials based on failure to interview is a direct consequence of the failed administration of Defendant's SNAP program. These denials are not based on the applicant's eligibility but on the inadequacies of Defendant's process. Eligible households have limited resources and incomes below the federal poverty line and many face daily challenges with transportation, telephone minute limitations, and access to the internet. Some applicants face literacy challenges and have limited educations. Effective participation in the SNAP program requires applicants to receive the access and assistance federal program guidelines provide. Here, Defendant is not meeting those requirements.

The insufficiency of Defendant's administration of the program first became most obvious and undeniable while the State faced COVID-19 issues resulting in the closure of several offices and the resulting increase in reliance on the telephone system. However, even after COVID-19 the system's failures persist. The system, as currently administered, is clearly insufficient for the timely submission of applications and completion of required interviews by eligible applicants. Missourians suffering from food insecurity go hungry and/or are forced to seek alternative sources of food as a direct result of the system's inadequacy. Defendant is simply failing to meet the obligations established for administration of the program.

The changes, modifications, and adjustments made by DSS after increasing its reliance on its telephone system to process SNAP applications have, based on the record presented to this Court, proven unsuccessful in fulfilling Defendant's responsibility to provide timely, accurate, and fair service for applicants and participants in the program. While call wait times fluctuate and have

37

shown some improvement, the record demonstrates too little progress. Consequently, Missourians who suffer food insecurity have been forced to either go hungry or seek alternative sources of food. Efforts by DSS have not made progress in adding needed manpower. The hours of operation of the telephone system and in person offices have not been expanded to accommodate the needs of eligible applicants. The denial of benefits to eligible households based on the inability to complete timely interviews remains unacceptably high.

The Court is mindful that correcting the problems in the system, which have persisted for several years, cannot be solved easily or immediately. Further, the Court is reluctant to engage in micromanagement of Defendant's administration of the program or to dictate any state resource allocation. However, the Court is charged with requiring Defendant to adhere to the requirements of SNAP and the ADA, including Defendant's obligation under the SNAP program and federal law.

Based on the Court's finding that Defendant's administration of SNAP does not fulfill its obligations under federal law and violates its responsibilities under the ADA the Court hereby orders as follows:

1. Within thirty days of this order, Plaintiffs shall submit to this Court a report detailing the specific changes they contend are required to make Defendant's provision of SNAP benefits lawful and ADA compliant. Each proposed change must be separately and clearly identified. Defendants are required to respond to Plaintiffs' report within thirty days. Defendant shall identify 1) the resources, including time necessary, to effectuate each proposed change; 2) the barriers that currently stand in the way of Defendant effectuating the change; and 3) the metrics that would most effectively capture any effort on the part of

Defendant to effectuate the change. Plaintiffs shall have fifteen days to reply to Defendant's response to Plaintiff's report.

2. Defendant is ordered to file monthly reports ("the monthly report") with this Court indicating: 1) the number of SNAP applications denied due to the failure to conduct timely interviews; 2) the percentage of denials based on the failure to complete timely interviews; 3) the low, high, and average wait times for callers under Tier 1 and Tier 3; 4) the number of calls which were deflected or redirected daily; 5) the number of calls that are disconnected by the caller prior to connecting with a representative, including the average wait times prior to disconnection; and 6) the number of applicants who requested accommodations under the ADA. These monthly reports must include any changes in definitions and data collection methods that would prevent meaningful comparison of data points from month to month.

3. A copy of each monthly report should be provided to the Missouri Governor's Office, the Speaker of the Missouri House of Representatives, the minority leader of the Missouri House of Representatives, the President Pro Tem of the Missouri Senate, the minority leader of the Missouri Senate, the chairman of the Senate Budget Committee, the ranking minority member of the Senate Budget Committee, the chairman of the House Budget Committee, the ranking minority member of the House Budget Committee, the chairman of the House Social Service Appropriations Committee, and the ranking minority member of the House Social Service Appropriations Committee. Reports shall be filed on or before the 15th of each month detailing the required information from the previous calendar month. The first report shall be due on June 15th and shall continue until further order of the Court.

39

4.  Within 90 days of this Order Defendant shall submit to the Court a proposed plan of action, including a timeline of implementation, to address shortcomings in the administration of SNAP as identified in this Order, including a reduction of call wait times and denials based solely on failure to interview, and its compliance with the requirements of the ADA. Plaintiff shall have fifteen days following Defendant's submission to submit comments.

5.  After the parties have complied with this Order, the Court will determine what, if any, further actions, orders, remedies, or proceedings are appropriate.

**IT IS SO ORDERED.**

Date: May 9, 2024

*s/ Douglas Harpool*
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**
