IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MARY HOLMES, DENISE DAVIS, ANDREW DALLAS and EMPOWER MISSOURI,<br><br>Plaintiffs,<br><br>vs.<br><br>JESSICA BAX in her official capacity Acting Director of the Missouri Department of Social Services,<br><br>Defendant. | Case No. 2:22-cv-04026-MDH |

**SUGGESTIONS IN SUPPORT OF DEFENDANT'S PROPOSED RELIEF ORDER**

On February 18, 2025, this Court ordered the parties in this case to submit proposals and recommendations to address the issues described in the Court's May 9, 2024, order regarding Defendant's administration of the Supplemental Nutrition Assistance Program (SNAP). Defendant has submitted a proposed order outlining a plan for complete and appropriate relief. Defendant provides these suggestions in support to demonstrate why its proposed order constitutes such relief. These suggestions primarily focus on Defendant's proposed call center performance metrics and efforts to end wrongful denials.[1]

**I. Background**

On May 9, 2024, this Court found Defendant's administration of SNAP did not fulfill the minimum requirements imposed by federal law. The Court found "too little progress" has been

---

[1] Defendant's impression is that, with a handful of exceptions, the parties generally agree in principle as to what constitutes appropriate relief on issues related to households' right to file a SNAP application and Defendant's obligations under the Americans with Disabilities Act. Defendant intends to clarify where the parties' positions diverge at the upcoming hearing on March 10, 2025.

1

made to improve the time applicants must wait on the phone to obtain a SNAP eligibility interview. The Court determined that these wait times resulted in an "unacceptably high" rate of denial of SNAP applications for "the inability to complete timely interviews[.]"

The Court has not yet ordered Plaintiffs' equitable relief as it relates to these findings. The Court noted that it wishes to avoid ordering relief that would involve "micromanagement of Defendant's administration of the program" or "dictat[ing] any state resource allocation." Nevertheless, the Court made clear its intention to order relief that ensures Defendant fulfills its obligation of the lawful administration of SNAP.

## II. Legal Standard

When crafting injunctive relief any injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano vs. Yamasaki*, 442 US 682, 702 (1979). "[A]n injunction must be tailored to remedy specific harm shown." *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir. 1982). "The federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Spallone v. United States*, 493 U.S. 265, 276 (1990). "If [a remedial order] is not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers." *Horne v. Flores*, 557 U.S. 433, 450 (2009) (brackets and quotation marks omitted). A remedy therefore "may require only" what is necessary to "bring the conditions above constitutional minima." *Toussaint v. McCarthy*, 801 F.2d 1080, 1086-87 (9th Cir. 1986).

"[L]anguage in an injunction that essentially requires a party to obey the law is overbroad and unenforceable because those against whom the injunction is issued 'must receive fair and precisely drawn notice of what the injunction actually prohibits.'" *Carson P. ex. Rel. Foreman vs.*

*Heineman*, 240 F.R.D 456, 507 (D. Neb. 2007) (quoting *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir.1987)). Similarly, a declaratory action seeking merely to declare government actors failed to carry out their statutory duties provides no specific or concrete relief against the state actor and is properly dismissed. *See Hill v. Ogburn*, 812 F.2d 679, 682 (11th Cir. 1987).

**III. Discussion**

Regarding call center performance and wrongful denials, there are two components to ensuring Plaintiffs obtain complete relief. First, Defendant recognizes the Court must set performance targets that assure SNAP applicants are not denied for failing to interview through no fault of their own. Second, Defendant acknowledges that there must be a process for ensuring applicants who have attempted to interview are not denied for a failure to interview on the 30th day after they apply.

      A. Call Center Performance

Defendant's proposed order includes providing an average speed to answer (that is, the time between entering queue and starting an interview) of 40 minutes[2] and an "unable to complete interview" (UCI) rejection rate of 40%. Defendant recognizes these metrics could be viewed as setting too low a bar, if only based on a general sense of what constitutes adequate customer experiences from private-sector customer service call centers. But when viewed in light of several important factors, Defendant believes the Court will find the proposed order provides reasonable targets for what constitutes the legal floor for administering the SNAP interview system.

---

[2] Defendant is prepared to discuss at the March 10, 2025, hearing the changes it is implementing to meet the goals in the proposed order. In the broadest terms, Defendant will take steps to significantly cut the duration of interviews, and will take additional steps (including but not limited to automating functions) to allow the redirection existing staff to assist with interview requests.

3

Two primary considerations inform the goals for call center performance presented in Defendant's plan of action. First, Defendant's proposed targets align with many decades of accepted, legal SNAP administration practices. Second, regardless of the performance metrics in place, the administrative hearing system provides a parallel process through which SNAP applicants can redress alleged wrongful denials. Moreover, Defendant's proposed metrics ensure that the current system, one designed to be accessible to the largest number of potential beneficiaries, continues to operate and improve. Defendant addresses the considerations informing its goals below.

1. Historical Context

Historical context supports the reasonableness of Defendant's proposed performance metrics as a "legal floor" for assessing the interview system's accessibility. Complaints about procedural complexity in obtaining SNAP, and the amount of time needed to complete the application process, have existed for nearly as long as the program itself. As far back as the early 1980s, studies suggested as many as a quarter of otherwise eligible individuals eschewed attempting to access SNAP benefits due to "administrative hassles[.]"[3]

Defendant is aware that specific historical data points are more helpful to the Court than broadly gesturing to the complexities of conducting SNAP interviews in the past. Although historical documentation of wait times for SNAP eligibility interviews is scant, Defendant located three studies that support Defendant's proposed 40-minute answer time, rather than Plaintiffs' more ambitious demands, which represents the correct proxy for assessing the *legality* of the interview system's accessibility.

---

[3] Susan Bartlett & Nancy Burnstein, Food Stamp Program Access Study, 3 (November 2004) (*available at*, https://www.ers.usda.gov/webdocs/publications/43390/30283_efan03013-3_002.pdf?v=8229.6) (citing other studies from the 1980s regarding non-participation in SNAP).

The first of these studies, commissioned by the federal government in the early 2000s, examined the state of public assistance programs in Oklahoma in the wake of the welfare reform efforts undertaken in the 1990s.[4] Oklahoma was specifically selected for this study because the state's "[SNAP] caseload has dropped by less than the national average" between 1994 and the 2001. The study found individuals seeking in-person interviews for expedited SNAP benefits waited, on average, 45 minutes to be seen.

A second study commissioned by the federal government reviewed the eligibility procedures of state public assistance agencies.[5] The study singled out states like Maine and Connecticut as noteworthy examples of states that had achieved excellent standards. In those states, individuals could expect to be seen by a worker within 15-20 minutes of arriving to the welfare office, even without an appointment. Wherever the legal floor for impermissible wait times lies, these examples suggest it is, at a minimum, significantly above the best-in-show 20-minute mark.

Finally, regarding the UCI rejection rate, the data Defendant located indicates that a standard of 40% of the total number of rejections is a reasonable figure for assessing the interview system's baseline legality.[6] One study from California found that in Los Angeles County, one-third of *all* applications were rejected for failing to complete an eligibility interview. This represents an

---

[4] Allison Logie & Liz Schott, State of Oklahoma: Improving Food Stamp, Medicaid, and SCHIP Participation: Strategies and Challenges, 37 (Feb. 2002) (available at: https://www.mathematica.org/~/media/publications/pdfs/oklahoma.pdf).

[5] LaDonna Pavetti, et al., Promoting Medicaid and Food Stamp Participation: Establishing Eligibility Procedures That Support Participation and Meet Families' Needs, 46 (June 2002) (available at: https://www.acf.hhs.gov/sites/default/files/documents/opre/medicaid_fstamp.pdf) (hereinafter "Mathematica Study").

[6] Eric Giannella et al., Administrative Burden and Procedural Denials: Experimental Evidence from SNAP, 22 (2023) (available at: https://www.nber.org/papers/w31239). Note: this study reports interview call center wait times that are, at a glance, far below the standards in Defendant's proposed order. Defendant notes that the California study was a pilot project that operated an on-demand call center accessible only by a small percentage of SNAP applicants. The statistic cited in these suggestions relates to the standard SNAP interview system, specifically in Los Angeles County.

effective UCI rejection rate of nearly 65% of the total number of rejections.[7] This UCI rate exists despite the fact that California consistently ranks near the top of the list for administrative spending in operating SNAP.

The goal will always be for an agency to minimize these rejections: each one represents a potential loss of benefits to an otherwise qualified applicant, and each one marks a loss of resources on the part of both the applicant and the agency. However, by its mere existence, the interview requirement will lead to some applicants' rejection, regardless of how well a state operates its interview system. The California study indicates that a 40% UCI rate is a reasonable approximation of when an interview system moves beyond an acceptable number of UCI rejections based on the inherent difficulties associated with the interview requirement.

2. Administrative Hearing Availability

The existence of DSS's administrative hearing system also speaks to a lack of need for the Court to set more stringent performance metrics. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Clark v. Kansas City Missouri Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (applying the *Hudson* rule even to "unauthorized, random acts" of a state employee). "This rule is premised on 'the states' action ... not [being] complete until and unless it provides or refuses to provide a suitable post-deprivation remedy.'" *Clark*, 375 F.3d at 702 (citing *Hudson*, 468 U.S. at 533). Here, there is a post-deprivation

---

[7] The UCI rejection rate as reported in this case represents the percentage of rejection for incomplete interview relative to all *rejections*, not all *applications*. If described as a percentage of all applications, the UCI rate provided to the Court would be much lower than what is currently represented in Defendant's monthly reports.

remedy in place: applicants who believe they were wrongfully denied SNAP benefits may seek review through an administrative hearing, an option of which all applicants are made aware.

Defendant recognizes that the mere existence of the administrative hearing system does not obviate the Court's role in ensuring minimum legal requirements are met when administering SNAP. But the availability of administrative hearings should ensure the Court that it does not have to overcompensate by ordering overly stringent performance metrics. Such metrics are not required and may impede Defendant's ability to fulfill its other legal obligations.

### 3. Policy Considerations

Defendant is concerned that an order creating more stringent interview requirements than those found under SNAP's normal rules would make continuation of the on-demand waiver impracticable, and perhaps even impossible. The on-demand interview system is, ultimately, optional. Defendant does not wish to end the on-demand waiver[8]; however, if Defendant is unable to comply with the legal obligations the Court attaches to the waiver through its remedial order, there may be no choice but to return to the appointment-based model provided for under applicable federal regulations.

Defendant asks the Court to recognize that any system designed to meet SNAP's interview requirement cannot be flawless. The interview requirement itself will inevitably result in rejection of some applicants. For example, a fully in-person model reduces access for individuals who are unable to go to a benefits office, but potentially leads to fewer individuals whose benefits are wrongly denied. Defendant's current on-demand system increases accessibility for applicants, but carries a greater risk of wrongful denials. Defendant urges this Court to consider that strident performance metrics, ordered when Defendant lacks the resources to meet them, could leave

---

[8] Defendant also notes that its federal partners also have the authority to eliminate the on-demand waiver, regardless of Defendant's wishes.

7

Case 2:22-cv-04026-MDH    Document 213-2    Filed 02/28/25    Page 7 of 11

Defendant with no choice but to return to a solely in-person model as the Court cannot directly vest Defendant with additional resources to expand the scope of its operations.

B. Wrongful Denials

Defendant's proposed order also contains new procedures for ensuring applicants are not wrongfully denied benefits at the 30-day mark when they are not at fault for failure to complete an interview. These procedures identify applicants who are making specified attempts to interview, and holding their applications past the normal 30-day processing deadline. Defendant maintains that its proposed plan balances the Plaintiffs' need for complete relief with the agency's legal obligation to timely and fairly evaluate SNAP applicants.

The legal authority to adopt the procedures outlined in Defendant's proposed order stems from existing federal SNAP regulations. Those regulations allow SNAP agencies to continue to process applications for an additional 30 days if the failure to complete an interview is not the applicant's fault. If the applicant has not completed an interview by the 60th day, the SNAP agency may then reject the application, regardless of fault.

Applying these rules to Missouri's SNAP interview system is complicated by two important factors. First, the regulations do not set a line at which wait times for interviews becomes so long that responsibility for a failed or incomplete interview shifts from an applicant to the agency. Second, "fault" is an individualized inquiry and wait times vary greatly depending on the day and time in which an applicant was available to contact the agency. Holding the agency to account for all incomplete interviews based on a wait time not specified in law is an overcorrection, as it woulduse equitable authority to grant procedural protections to non-cooperating applicants beyond those required under applicable law.

Defendants have proposed a solution for simplifying the inquiry as to when the "continued processing" rules apply to a given applicant, based on attempts to participate in the process and a demonstrated inability to be interviewed due to inaccessibility. To demonstrate good faith, Defendant has proposed criteria for continued processing that are even more generous than those reflected in its performance metrics. Specifically, Defendant will continue to process applicants who have waited 30 minutes, on two occasions, without being interviewed (the suggested performance metric is 40 minutes) as well as *any* applicant who has visited a resource center but did not obtain an eligibility interview that same day.

Identifying applicants for continued processing using criteria significantly broader than those presented in the proposed relief order is problematic for two reasons. First, expanding these criteria far beyond those suggested by Defendant would provide relief based not on a legal failing of the agency, but a speculative legal failing of the agency. The applicable regulations do not allow the agency to provide procedural protections based on the argument an applicant "would have" interviewed but for an *anticipated* wait time. The equitable remedies the Plaintiffs have requested the court to exercise are subject to similar limitations. Additionally, relief that over-identifies individuals for continued processing endangers the administration of SNAP for all Missourians. The federal government takes timely processing of applications seriously; an order that forces the agency to improperly delay processing certain applications could jeopardize the program's funding. When determining who should be included for continued processing, these two concerns support the conclusion that Defendant has made a reasoned attempt to identify the appropriate target for the court's remedial powers.

Defendant's proposed measures provide relief that is legally appropriate in its scope and will bring meaningful, positive impacts to SNAP applicants and the state agency. First, the agency

9

will identify applicants with an in-fact inability to obtain an interview and provide them with *pre-denial* relief in the form of continued processing without having to affirmatively request the relief. This is in addition to the post-denial relief available to all SNAP applicants, including those who are not included in this identified group, in the form of administrative review through a fair hearing. Second, Defendant is optimistic that this plan will increase the agency's interview capacity by reducing a form of "churn," in which applicants who are denied immediately turn around and file new applications the very next month, applications which are likely similar in substance to the one submitted when they originally applied but which must nevertheless be processed anew.

## IV. Conclusion

For the reasons above, Defendant believes the proposed remedy submitted provides the plaintiffs with full relief, while being "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano vs. Yamasaki*, 442 US 682, 702 (1979).

Respectfully Submitted,

ANDREW BAILEY
Attorney General of Missouri

By: /s/ *Hardin T. Haynes*

Hardin T. Haynes, #67474
*Assistant Attorney General*
Missouri Attorney General's Office
207 W. High Street
Jefferson City, MO 65102

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was forwarded to all attorneys of record via the Court's electronic filing system this 28th day of February, 2025.

By: */s/ Hardin T. Haynes*